**Fred L. GADDIS and Mary F. Gaddis, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**GADDIS BREEDER FARMS, INC., Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 4420, 4421.**

United States District Court, S. D. Mississippi, Jackson Division.

June 18, 1971.

James P. Knight, Jr., Louis H. Watson, Jackson, Miss., for plaintiffs.

Jack Warren, Tax Division, Department of Justice, Washington, D. C., for defendant.

NIXON, District Judge.

## MEMORANDUM OPINION

The above styled and numbered income tax recovery cases filed pursuant to Title 28 U.S.C. § 1346(a) were consolidated by this Court pursuant to the agreement of all parties hereto inasmuch as the parties plaintiff are related through stock ownership, all issues arise from examination of income tax returns of the corporate plaintiff in Civil Action No. 4421.

These cases were tried to the Court on May 17, 1971 at Jackson, Mississippi and pursuant to the pleadings filed herein, all evidence adduced, the contents of the agreed Pre-Trial Order submitted and filed herein and the memoranda of authorities filed by the parties, the

Court in this Memorandum Opinion makes its following Findings of Fact and reaches its Conclusions of Law as required by Rule 52(a), F.R.Civ.P.

Civil Action No. 4420 was instituted by Fred L. Gaddis and wife, Mary F. Gaddis, against the defendant, The United States of America, for the recovery of income taxes paid in the fiscal taxable years 1965 and 1966 in the total amount of $1,885.20 plus interest and costs. In Civil Action No. 4421 the corporate plaintiff, Gaddis Breeder Farms, Inc., sues for recovery of income taxes paid to the defendant for the fiscal year 1966–1967 in the amount of $132,243.16, plus interest and costs. All legal prerequisites to the institution of these actions have been complied with and these actions are, as a procedural matter, properly before this Court.

## I.

The basis of the individual plaintiffs' refund claims in Civil Action No. 4420, is as follows: during 1965 and 1966, the plaintiff in Civil Action No. 4421, Gaddis Breeder Farms, Inc., whose sole and only stockholders were the plaintiffs in Civil Action No. 4420, Fred L. Gaddis and Mary F. Gaddis and trusts set up for their children, were the recipients or beneficiaries of the amounts of $280.20 and $1,605.00, respectively, which were paid by the corporation in the fiscal years ending April 30, 1965 and 1966, respectively, to liquidate personal debts of Mr. and Mrs. Gaddis, its principal stockholders. The Commissioner of Internal Revenue determined that these amounts represented personal expenses of Mr. and Mrs. Gaddis and were not deductible corporate expenses, which fact is not disputed; therefore, the Commissioner determined that such amounts represented informal dividends to Fred L. and Mary F. Gaddis, and as a result of this determination additional taxes were assessed and collected from them for 1965 and 1966 which they now seek to recover in view of the fact that on

November 13, 1968, pursuant to the following resolution which had been adopted by the Board of Directors of Gaddis Breeder Farms, Inc. on June 8, 1959, the Gaddises repaid Gaddis Breeder Farms, Inc. the $1,885.20 which it had paid out to liquidate the above debts. The above resolution reads as follows: [1]

"It is hereby agreed between this corporation and its officers that in the event any expense made to or by any officer is declared to be a nondeductible item, then the officers shall repay the corporation from his or her personal funds."

The defendant maintains that the $1,885.20 payment constituted informal dividends to the individual plaintiffs and thus disallowed these items as capital expenses of the corporation and taxed them as income to the stockholders. The individual plaintiffs contend that these payments were not intended as and did not constitute dividends but were merely erroneous payments made by the corporation which the individual taxpayers were contractually obligated to repay pursuant to the above resolution which had been signed by them as President and Secretary of the corporation and which they repayed on November 19, 1968.

Thus, in Civil Action No. 4420 the only issue for decision is whether the amounts reclassified from corporate expense to dividends by the Internal Revenue Service constitute taxable income to the individual majority stockholders despite their obligation to repay these amounts pursuant to the above resolution adopted several years before.

This Court is of the opinion and finds that the resolved obligations to return or repay these funds was binding on the plaintiffs in Civil Action No. 4420 inasmuch as the stockholders signed the minutes in question as Directors of the corporation and therefore were in no position to deny the existence or validity thereof and which they did honor by reimbursing Gaddis Breeder Farms, Inc.,

1. See Exhibit P–18.

the plaintiff in Civil Action No. 4421, in the amount of its disallowed expense. Because of the fact that the corporation was quite large and growing and its activities were diversified and the financial interest of the individual plaintiffs were complicated, it was reasonably foreseeable either that inadvertent errors might be made in accounting for expenditures made by the above named various business entities, comprising "Gaddis Industries", or that judgmental factors might be questioned to the extent that income tax deductions might be subsequently disallowed.

In Healy v. Commissioner of Internal Revenue, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007 (1953), an individual taxpayer received a salary from a closely held corporation and reported it in full in his income tax return for the year in which it was received. In a subsequent year it was determined that the salary was excessive and the taxpayer was required as transferee to make payments on tax deficiencies of the corporation for prior years. The Supreme Court, in holding that the taxpayer's income tax for the year in which he received the excessive salary may not be recomputed so as to exclude from his income that year the part of his salary held to be excessive and which resulted in his transferee liability inasmuch as he received the salary under a "Claim of Right", and was required to report it as income and to pay a tax thereon, stated:

"One of the basic aspects of the federal income tax is that there be an annual accounting of income (cases cited in footnote 6). Each item of income must be reported in the year in which it is properly reportable and in no other. For a cash basis taxpayer, as these three are, the correct year is the year in which received (cases cited in footnote 7).

"Not infrequently, an adverse claimant will contest the right of the recipient to retain money or property, either in the year of receipt or subsequently. In North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197, we considered whether such uncertainty would result in an amount otherwise includible in income being deferred as reportable income beyond the annual period in which received. That decision established the claim of right doctrine 'now deeply rooted in the feder tax system.' The usual statement of the rule is that by Mr. Justice Brandeis in the North American Oil opinion: 'If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.' 286 U.S., at page 424, 52 S.Ct. at page 615.

" * * * There is a claim of right when funds are received and treated by a taxpayer as belonging to him. The fact that subsequently the claim is found to be invalid by a court does not change the fact that the claim did exist. A mistaken claim is nonetheless a claim, United States v. Lewis, 1951, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560.

* * * * * *

" * * * The Government concedes that each of these taxpayers is entitled to a deduction for a loss in the year of repayment of the amount earlier included in income * * * Congress has enacted an annual accounting system under which income is counted up at the end of each year. It would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system. This basic principle cannot be changed simply because it is of advantage to a taxpayer or to the Government in a particular case that a different rule be followed." 345 U.S. 281–282, 284–285, 73 S.Ct. 673–674, 675.

This "claim of right" doctrine has also been discussed by the United States Court of Appeals for the Ninth Circuit in Noble v. C. I. R., 368 F.2d 439 (C.A. 9, 1966)., in which the Court affirmed the Tax Court which had disallowed as business expenses for income tax purposes certain payments made to the sole shareholders of a corporation which were found to be of a personal nature rather than a corporate expense. Subsequent to this determination the corporation passed a resolution requiring the shareholders to reimburse it for these admitted nondeductible payments. The Court stated:

"Dividends may be formally declared or they may be constructive. The fact that no dividends are formally declared does not foreclose the finding of a dividend-in-fact. (Cases cited are omitted).

\* \* \* \* \* \*

"Clearly, the payments in question here are of the type that would fall in the category of constructive dividends \* \* \* The question then arises whether after a determination that payments to the sole stockholders were for personal expenses, a subsequent act of the petitioners can convert what would then have been a taxable dividend into a repayment of a prior valid or outstanding loan from the sole shareholders to the corporation.

"Intention of the parties is not controlling. The fact, as stipulated by the parties, that the corporation and the petitioners did not intend these payments to constitute dividends, is not decisive. We said in Clark v. C. I. R., supra, 266 F.2d [698] p. 711,

'To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits under a claim of right or without any expectation of repayment.' Healy v. Commissioner [of Internal Revenue], supra; Biltmore Homes, Inc. v. C. I. R. [4 Cir., 288 F.2d 336], supra.

\* \* \* \* \* \*

" \* \* \* Inasmuch as it is agreed that the expenses for which they were reimbursed were personal in nature, and not connected with the corporate business, the moneys they received were dividends and should have been included in their tax returns (cases cited are omitted).

\* \* \* \* \* \*

"The federal income tax program is based on a system of annual reporting. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383. Under this system, an individual's income tax return is supposed to reflect all income activity of the one reporting year. If one year's income could be changed by events occurring in subsequent years, there would never be any finality in the system. United States v. Lewis, 340 U.S. 590, 71 S. Ct. 522, 95 L.Ed. 560, rehearing den. 341 U.S. 923, 71 S.Ct. 741, 95 L.Ed. 1356; United States v. Lesoine, 9 Cir., 203 F.2d 123; Phillips v. C. I. R., 9 Cir., 262 F.2d 668. Returns could be reopened and altered, to the confusion of fiscal policy and revenue collection. Thus, the present scheme of providing finality for each reporting period, would be violated were the taxpayers permitted to alter the effects of earlier income periods by their subsequent acts. (Cases cited are omitted). To permit otherwise would allow the taxpayer to 'second-guess' the government in instances where more than one treatment of a transaction is possible, 'And, it is not given to a taxpayer to lift the federal tax-hand from income, which he once received in absolute right, by an attempt thereafter to alter its legal status through modification of the agreement out of which

it arose.' Leicht v. Commissioner of Internal Revenue [8 Cir., 137 F.2d 433], supra, p. 435."

■ Based on the foregoing authority, this Court finds and is of the opinion that the payments by Gaddis Breeder Farms for the benefit of Fred L. Gaddis and Mary F. Gaddis in the amounts of $280.20 and $1,605.00 in the fiscal years ending April 30, 1965 and 1966 constituted constructive dividends which they received the benefit of under a "claim of right" and thus were properly taxable to them for those two years, despite the fact that they reimbursed the corporation during the fiscal year, 1968–1969 for which taxable year they are entitled to a deduction for the repayment of the $1,885.20.

## II.

In Civil Action No. 4421, the three issues presented for this Court's determination are whether the corporate plaintiff, Gaddis Breeder Farms, Inc., is entitled to recover from the defendant, the United States, any or all of the additional income taxes assessed against it for the fiscal year 1966–1967, plus interest and costs, as a result of its payment of additional income taxes, penalty and interest which it contends were erroneously and illegally assessed and collected by the District Director of Internal Revenue after its filing of its corporate United States income tax return on July 15, 1967 for the fiscal year ending April 30, 1967. These taxes were subsequently paid and their following claim for refund was refused or disallowed: (1) on or about July 22, 1968 plaintiff was assessed additional income taxes in the amount of $39,174.47, penalty in the amount of $1,958.72 and interest in the amount of $1,847.57, all of which was paid on July 22, 1968; (2) the assessment on October 31, 1968 of additional income taxes in the amount of $109,-668.92, penalty in the amount of $5,-483.45, and interest in the amount of $8,-531.64. Plaintiff alleges that the foregoing additional income taxes, penalty and interest were erroneously and illegally assessed and collected to the extent of $132,343.16 and has filed its suit herein for the recovery thereof, together with legal interest.

Specifically, the corporate plaintiff contends that: (1) the Internal Revenue Service improperly disallowed as expense $228,476.90 of the $247,132.50 which it actually paid during the fiscal year ending April 30, 1967 for feed used by its trade or business of production of marketable chickens and eggs, based on the fact that delivery of most of this feed was made in the following fiscal year; (2) that its purchase of watering troughs, valves, waterers, feed hoppers, nests and egg baskets, purchased and paid for in its fiscal year ending April 30, 1967, constituted expendable supplies rather than capital expenditures and therefore the amount of $11,236.97 (although the amount of $14,232.81 was sued for it was stipulated at trial that this amount was excessive by $2,995.84) paid therefor was deductible in the year of payment and improperly disallowed as corporate expense; and (3) that it did all that a reasonable and prudent person or entity could do to insure accuracy in recording and reporting its financial transactions, and therefore the imposition of a negligence penalty against it in the amount of $7,442.17 was not warranted.

On the other hand, the defendant contends that the payment for the chicken feed was not an ordinary or necessary expense but was merely a deposit or in the alternative, it constituted an unnecessary and unusual advance payment which the plaintiff was not required to make and through which it secured no economic, financial or other business benefit and thus did not constitute ordinary and necessary expense paid or incurred during the taxable year in carrying on any trade or business. The Government further contends that if these payments were allowed as a tax deduction for the fiscal year ending April 30, 1967, plaintiff's taxable income therein would be materially distorted. The defendant takes the posi-

tion that the amounts paid for the various items including the valves, troughs, nests, feed hoppers, and egg baskets did not constitute ordinary and necessary business expense paid or incurred during the taxable year in question in carrying on the plaintiff's trade or business and that the cost of these items was properly capitalized rather than be treated as expenses. Finally, the defendant Government urges that the plaintiff underpaid its federal income tax for its fiscal year ending April 30, 1967 and that at least a part of the underpayment was due to its negligence or intentional disregard of applicable rules and regulations, and thus the penalty was properly assessed.

Gaddis Breeder Farms, Inc. is a corporation organized and existing under Mississippi law with its principal place of business at Forrest, Scott County, Mississippi. Its business is farming, and more specifically, the production of marketable chickens and eggs. All of its capital stock issued and outstanding was owned during the taxable year in question by Fred L. Gaddis, his wife, Mary F. Gaddis, and trusts for the benefit of their children. This corporation consistently utilized the cash receipts and disbursement system of accounting and filed its United States income tax returns in accordance therewith for each fiscal year ending April 30. The issues involved herein arose from adjustments made by the Internal Revenue Service on plaintiff's income tax return which was timely filed for the fiscal year ending April 30, 1967. The plaintiff corporation, whose President is Fred L. Gaddis, the Mayor of Forrest, Mississippi, was organized in May of 1959 and its principal business is producing broilers and farm-related items. It owns and operates 32 farms as well as 11 leased farms and 27 contract farms. The company-operated farms comprise approximately 3,000 acres, and each year approximately 350 flocks of chickens are produced or grown, totalling approximately 12 to 13 million broilers per year. Normally, approximately 10 weeks is required to produce or raise a broiler to marketable size. The volume of sales of Gaddis Breeder Farms, Inc. during the fiscal year in question was $5,909,654.63. Its purchases for baby chicks and feed during that year approximated $4,830,507.-44, the latter consisting principally of yellow corn and soybean oil meal in addition to vitamin packages, fishmeal, alfalfa meal and other ingredients. The plaintiff corporation obtained its feed for these chickens during the fiscal year ending April 30, 1967 from areas all over the United States and from some foreign countries, and obtained its corn and soybean oil meal from local distributors, brokers, Paymaster Oil Mills, Cargill, Inc. and other companies located primarily throughout the Southern part of the United States. Gaddis Feed Mill supplied the feed that was sold to the plaintiff corporation until it was purchased by the plaintiff on December 31, 1966 in order to make it an integral part of Gaddis Breeder Farms' operations. The plaintiff acquired the majority of the assets of Gaddis Feed Mill and assumed all of its liabilities, including those incurred in the purchase of feed, and including some of that in issue herein. Fred L. Gaddis' brother, Taylor Gaddis, administered and ran the feed mill and had authority to contract for and on behalf of both Gaddis Feed Mill and Gaddis Breeder Farms at all times in question herein. Both of these corporations as well as several other corporations and companies owned by the Gaddis family operated under the non-recorded trade name of "Gaddis Industries".

The first issue presented with reference to the refund claim of Gaddis Breeder Farms, Inc. is whether it was entitled to deduct payments made for chicken feed during the taxable fiscal year ending April 30, 1967, or whether it must defer these costs until the following fiscal year during which the feed was used.

On October 20, 1966, "Gaddis Industries" entered into a contract with the grain division of Cargill, Inc. (Cargill) for the purchase of 420,000 bushels of corn to be delivered to Gaddis Industries

at Forrest, Mississippi. Cargill issued to Gaddis Industries two documents entitled "Contract of Sale" relating to a total of 182,000 bushels of yellow corn to be delivered to and paid for by the plaintiff corporation. One "Contract of Sale" covered 122,000 bushels approximately half of which was to be delivered in April, 1967, and half in May, 1967 at a price of 5¾ cents above the price of May corn fixtures on the Chicago Board of Trade. The second "Contract of Sale" covered 60,000 bushels to be delivered in June, 1967 at a price of 6¼ cents over the July corn fixtures on the Chicago Board of Trade. On November 1, 1966, Cargill issued its "Confirmation of Pricing" with respect to the above sales contracts, stating a cash price of $1.52⅝ cents for the 122,000 bushel lot. In all, Cargill issued four documents to "confirm sale" of the total of 420,000 bushels of corn to Gaddis Industries of Forrest, Mississippi and the contracts of sale bore the following respective numbers: R–15219, R–15220, R–15221 and R–15222. Substantially all of the corn referred to in these contracts was delivered to and paid for by the plaintiff, Gaddis Breeder Farms, Inc.

On November 1, 1966, Cargill issued its confirmation of pricing with respect to the corn referred to in Contracts Nos. R–15220 and R–15221 respectively reflecting a cash price of $1.52⅝ cents for the 122,000 bushel lot and $1.54¾ cents for the 60,000 bushel lot.

On April 18, 1967, Cargill issued its Invoice No. G–30145 relating to 66,000 of the 122,000 bushel lot, the portion to be shipped in May of 1967. The total amount of this invoice was $100,732.50, and on April 26, 1967 the plaintiff corporation issued to Cargill its Check No. 9654 in the same amount to pay for the above 66,000 bushels of corn. Of the corn which the plaintiff corporation paid for with its $100,732.50 check, $18,655.60 worth was delivered prior to the close of the fiscal year, April 30, 1967. The remainder of the corn paid for was delivered during May, 1967.

On April 27, 1967 Cargill issued its Invoice No. G–30199 relating to 40,000 of the 60,000 bushels of corn which was the subject of Contract No. R–15221, and the plaintiff issued its Check No. 9677 to Cargill in the amount of $61,900 in payment of these 40,000 bushels. All of the corn paid for with Check No. 9677 was delivered to plaintiff in May and June of 1967.

On April 24, 1967, the Paymaster Oil Co., a division of Anderson, Clayton and Company (Paymaster) another feed supplier, issued its "Confirmation of Sale" No. 2015–J to the plaintiff corporation of 1,000 tons of soybean oil meal at a "provisional price" of $84.50 per ton, with payment to be made upon receipt of its invoice, shipments to be made in 250 ton lots during the first, second, third and fourth weeks of May, 1967. The "Confirmation of Sale" provided that the "price was to be set prior to each week's shipment with a net adjustment thereof to be made at the completion of the contract". On April 29, 1967, plaintiff issued to Paymaster its check in the amount of $84,500.00 in payment for the soybean oil meal referred to in the above "Confirmation of Sale", all of which was delivered in May and June of 1967.

In its Federal Income Tax Return filed for the fiscal year ending April 30, 1967, the plaintiff, Gaddis Breeder Farms, Inc. claimed as business expense deductions (through its purchases account) the $162,632.50 it paid for the corn which was the subject of Cargill Invoices Nos. G–30145 and G–30199 and the $84,500 it paid to Paymaster for the soybean oil meal which was the subject of Paymaster's Confirmation of Sale No. 2015–J. Upon an audit of this return, the Commissioner of Internal Revenue (Commissioner) disallowed these deductions except for $18,655.00 representing the cost of corn paid for and actually delivered within the April 30, 1967 fiscal year. The latter was part of the corn referred to in Cargill Invoice No. G–30145 and payment therefor was included in plaintiff's Check No. 9654 for

$100,732.50. Although the evidence shows that the above contracts were executed by "Gaddis Industries", this was a trade name used for many years by the conglomeration of Gaddis owned businesses, including the plaintiff, Gaddis Feed Mill was the only Gaddis entity or company operating under this trade name which at that time was purchasing feed.[2] As previously stated, Gaddis Feed Mill was purchased by plaintiff, Gaddis Breeder Farms, Inc. on December 31, 1966, at which time the plaintiff assumed all of the Feed Mill's obligations and liabilities, and in fact did comply with the terms and provisions of these two Cargill contracts.

The two Cargill contracts in question, R–15220 and R–15221, provided that "Title and risk of loss shall pass to the buyer at the time each shipment hereunder is directed to buyer or his Order or for his notification, or if in transit at the time this contract is made at the time shipment is so redirected." Exhibit D–7 evidences that shipments relating to Contract R–15220 had been made before the end of plaintiff's fiscal year, April 30, 1967 and thus performance was substantially completed, and that title to 68,223.36 of the 122,000 bushels of corn had passed to plaintiff at that time, at a price of $1.52⅝ cents per bushel or $104,125.52.

The evidence is uncontradicted that all of the contracts in question were ultimately performed in full by the parties thereto and there was no attempt at any time to withdraw or seek a refund of any part of the payments made in advance of shipment. It is further undisputed that the plaintiff and its President, Fred Gaddis, at all time considered these contracts to be valid and binding. After these contracts were entered into, the plaintiff purchased corn at prices as low as $1.40 per bushel in May, 1967;[3] thus, if the Cargill contracts had not been binding and so considered by the plaintiff, it could, at an average difference of $.12 per bushel, have possibly saved over $21,000 on these 182,000 bushel transactions by cancelling and buying its corn locally.

It is therefore evident that title had passed to a material portion of the corn by April 30, 1967; that plaintiff and Cargill had in good faith entered into binding contracts of sale with reference to the remainder; and that the contracts were fully performed according to their terms. The payments made by the plaintiff to Cargill in the amounts of $100,732.50,[4] and $61,900[5] on April 26, 1967 and April 29, 1967, respectively, were not refundable deposits.

With reference to the soybean oil meal purchased by the plaintiff from Paymaster, the evidence is clear that a binding contract[6] was executed by the parties thereto on April 24, 1967, that payment of $84,500 was made by the plaintiff on April 29, 1967[7], and that delivery was subsequently made by Paymaster during May, 1967.[8] In the absence of contract provisions to the contrary, title passed upon execution of the Paymaster contract to plaintiff's pro rata share of the fungible mass in the storage bins of Paymaster.[9]

---

2. See 87 C.J.S. Trade-Marks, Trade-Names, and Unfair Competition § 178:
   " * * * Apart from the law of corporations, the contract of a person doing business under a trade-name, although made in the trade-name, is his individual obligation, and the rule that an undisclosed principal cannot be sued on a contract does not apply where the principal contracts in a trade-name. In like manner, contracts entered into under a trade-name which are not otherwise invalid are enforceable by the one who employs such trade-name."

3. See Exhibits P–11–15.

4. See Exhibit P–5.

5. See Exhibit P–8.

6. Exhibit P–9.

7. Exhibit P–10.

8. See Exhibit D–11.

9. Uniform Sales Act, § 6(2); Mississippi State Tax Commission v. Columbia Gulf Transmission Co., 249 Miss. 88, 161 So.2d 173, 178 (1964); United States v. Amal-

All of the elements required to bind both parties are present in the above three bilateral contracts inasmuch as there was mutual assent of the parties. Initially there was a promise for a promise, but before the end of the fiscal year in question there had been payments by plaintiff which served as consideration, and there was a partial delivery of corn purchased under one of the contracts with Cargill prior to the end of the fiscal year. The parties had the legal capacity to contract, the agreement was in writing, the objects of the contract were lawful, and neither party was in a position to deny nor did deny the binding effect of the contracts, but rather, both performed in accordance therewith at a time when the plaintiff maintained its records on the cash receipts and disbursements method of accounting, which latter fact is neither contradicted nor denied by the defendant. Also the defendant agreed and stipulated in the record that the contracts in question were binding on the parties thereto.

The delivery of the corn and soybean oil meal was contracted for by the plaintiff well in advance of delivery and of the end of its April 30, 1967 fiscal year, and it was paid for in full by the plaintiff, which had consistently utilized the cash receipts and disbursement system of accounting, prior to the end of its 1967 fiscal year although a substantial amount of the feed was delivered within the first two months of its next fiscal year. It is undisputed in the record and the Court finds that plaintiff placed its Order through Mr. Gaddis well in advance primarily because of his reliance on various financial publications which forecast an imminent increase in the price of feed or grain and the probable shortage thereof, including the October, 1966 issue of *The Farm Journal*,[10] an accepted, reputable and usually reliable publication which projected the general farm outlook. These predictions caused the plaintiff concern because of the necessity for its providing adequate feed for its presently owned chickens and those which it planned to produce during the following year.

It is further undisputed that the total storage capacity of Gaddis Feed Mill was 25,000 bushels of corn and less than 100 tons of soybean oil meal, making it impossible for the plaintiff to accept delivery of and adequately and safely store the full amount of the feed it had contracted to purchase.

This Court finds that although Fred L. Gaddis, President of the plaintiff corporation, was aware of the fact that payment for the corn and soybean oil meal in April, 1967 would create a tax deduction in the amount so paid within that fiscal year, nevertheless this was not his purpose in the timing of the purchase and payment therefor. However, even if such were the case, the defendant's argument that payments in question cannot be considered "ordinary and necessary" because they were tax-motivated, rather than made to acquire an economic benefit, has been rejected by the United States Court of Appeals for the Tenth Circuit which reversed the Tax Court in Cravens v. Commissioner of Internal Revenue, 272 F.2d 895 (C.A.10, 1959) in which the Court observed that "Cravens concedes that the tax implications of the transaction influenced his conduct. Tax motive is unimportant if the taxpayer does that which the law permits."

As previously pointed out, the predictions made with reference to the feared increase in the price of corn proved to be unfounded inasmuch as its price decreased in May, 1967 from the price of $1.52⅝ cents per bushel and $1.54¾ cents per bushel paid under the two Cargill contracts to $1.40 and $1.41 per bushel in May, 1967, at which price plaintiff purchased additional yellow corn. Therefore, had the contracts with Cargill been subject to cancellation, plaintiff could and probably would have attempted to do so to save more than

gamated Sugar Co., 72 F.2d 755, 758 (10 Cir. 1934); 77 C.J.S. Sales § 253.

10. See Exhibit P–2.

$21,000 by the purchase of corn on the open market.

The defendant contends that there was no binding contract between plaintiff and Paymaster with respect to the purchase of the soybean oil meal because the "Confirmation of Sale" called for a "provisional price" of $84.50 per ton with all shipments to be made during May, 1967, the first month of the ensuing fiscal year. It contends that pursuant to the terms of this agreement, the actual price was to be set prior to each week's shipment and a net adjustment on the price was to be made at the completion of the contract, "and thus it can be clearly seen that with respect to the transaction with Paymaster, the actual price of the feed was not to be set until the following fiscal year and plaintiff could be entitled to a refund from Paymaster during the later year". The Court rejects this contention of the Government inasmuch as it finds that as in the case of the two Cargill contracts for the purchase of corn, this was also a binding contract because the quantity of soybean oil meal which Paymaster was obligated to sell to plaintiff and plaintiff was obligated to purchase from Paymaster was specific and definite, a fixed price was established therefor which could be varied according to the agreement of the parties to reflect the prevailing market price at the time of the actual delivery and also in the event that the specified 50% protein content varied to any appreciable extent. This was a binding agreement between the parties and they were free to stipulate its terms and provisions within certain specified limits, which they did. This same argument of the Government was rejected by the Tenth Circuit in Cravens, supra, in the following language:

> "Under the contract the dates of delivery were not fixed, the prices were to be those prevailing on the dates of delivery, the quantities could have been varied 'to any reasonable extent; and if the advance payment had exceeded the ultimate cost, Cravens would have been entitled to a refund.

These factors are urged as establishing that there was no firm contract of sale and purchase and, hence, no obligation to pay the $50,000 in 1953. The answer is that the contract was binding and carried out by the parties.

\* \* \* \* \* \*

" \* \* \* In *Ernst* [32 T.C. 181] there was no condition such as the drought which confronted Cravens and no hazard of a distress liquidation. The fact that Cravens had the possibility of a refund if the cost of the 745 tons of feed was less than $50,000, an eventuality which did not occur, did not make his contractual obligation any less binding than that of Ernst. Cravens was bound to buy and did buy the agreed quantity. By his advance payment Cravens, unlike Ernst, secured the promise of preferred deliveries." 272 F.2d at 898, 900.

The adjustment of price provision in the Paymaster contract therefore was equivalent to the provision that "the prices would be those prevailing on the dates of delivery" which in *Cravens* was found to constitute a binding agreement. Unlike the situation in *Cravens* where "the quantities could have been varied to any reasonable extent", plaintiff herein was unconditionally obligated to accept 1,000 tons of soybean oil meal and therefore its contract with Paymaster, like its contracts with Cargill, was binding. Therefore, the amount paid was an expense, not a deposit, and the contracts contained the requisite specificity of quantity and quality of the feed found in the case of Estate of Frank Cohen v. Commissioner, T.C. Memo. 1970–272 (Sept. 24, 1970).

It is this Court's opinion that the disposition of plaintiff's claim for refund herein for the amounts paid for the feed in question is supported and controlled by the holdings of the Courts in all of the following and known reported cases on this question.

The issue of deduction of payments for chicken feed purchased in the fiscal

year ending April 30, 1967 is governed by § 162(a) of the Internal Revenue Code of 1964 which in part provides:

"Sec. 162 (1954 Code).

(a) *In general.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business including— * * * *"

The Commissioner of Internal Revenue has in fact provided in his Regulation 1.162–12 that:

" * * * The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay, but not including the value of farm produce grown upon the farm or the labor of the taxpayer. * * *"

In view of the foregoing, the only question for this Court is *when* the deduction is allowable. In arriving at this determination, it is important to note that the cash receipts and disbursement method of accounting employed by the plaintiff in maintaining its records and reporting its taxable income is expressly sanctioned by statute. Title 26 U.S.C. § 446(c). Sec. 461(a) of that same Title provides that:

"The amount of any deduction or credit allowed by this subtitle should be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income."

Under the cash receipts and disbursements method of accounting, expenditures are to be deducted in the year in which the payment is actually made. See Regulation 1.446–1(c) (1) (i).

Therefore, the foregoing authorities expressly authorize and sanction the deduction of the feed purchased in the year of payment, which is the fiscal year ending April 30, 1967, unless some exception exists. In this Court's opinion, the only possible exceptions which would defeat the plaintiff's refund claim would be·

(1) that the amounts paid were not ordinary and necessary business expenses of the plaintiff, (2) that the amounts paid constituted refundable deposits rather than payments made pursuant to binding sales contracts, or (3) that if the amounts of such payments were allowed as tax deductions for the plaintiff's fiscal year ending April 30, 1967, its taxable income for such year would be materially distorted. All three of these exceptions are urged by the defendant herein, and all are found to be without merit by this Court, because of the foregoing and following reasons based upon the facts and cited authorities.

This Court finds that the plaintiffs have proved not only by a preponderance of the evidence, but the overwhelming weight thereof that with respect to the corn purchased from Cargill that title had passed to a material portion thereof by April 30, 1967; that plaintiff and Cargill were subject to binding contracts of sale in respect to the remainder; that plaintiff actually paid the amount that it was obligated to pay under these contracts prior to the end of the fiscal year 1967; that the contracts were fully performed according to their terms; and that there was no refund of any kind made to the plaintiff by Cargill; and that there was no provision contained in any of the two contracts for services to be rendered. With reference to the purchase by plaintiff of the soybean oil meal from Paymaster, there was a binding contract (Exhibit P–9) executed by both parties on April 24, 1967 for the sale of a specified amount of meal pursuant to which plaintiff paid $84,500 on April 29, 1967 (Exhibit P–10). Delivery was subsequently made by Paymaster (Exhibit D–11), and in the absence of a contract provisions to the contrary, title passed on execution of the Paymaster contract to plaintiff's pro rata share of the fungible mass in the storage bins of Paymaster. All of the elements which this Court's Findings and Conclusions with reference to the Cargill transactions are equally applicable to the Paymaster transaction.

This identical issue was considered and decided in the case of another poultry farmer in Ernst v. Commissioner, 32 T.C. 181 (1959). In that case the Commissioner attempted to disallow payments made in 1948 and 1949 in the amounts of $20,532.50 and $110,330.00, respectively, on the grounds that the payments were advances on executory or contingent contracts for future delivery. In that case there was no shortage nor predicted shortage of feed during the relevant years, as there was in the case sub judice; the purchases exceeded the monthly requirements of the petitioner therein; and there was no contractual provision for refund of any part of the payments. The Ernsts borrowed the money to make the payment on those contracts as did the plaintiff in the case sub judice, but unlike the plaintiff here, had adequate storage facilities for full delivery upon payment. Actual deliveries extended over a period of six months in Ernst compared to the period of approximately two months in the case sub judice. The Court in *Ernst* held the payments to be deductible in the year of payment stating:

"The payments were absolute and petitioner, who reported his income on a cash receipts and disbursement basis, was irretrievably out of pocket the amounts paid, which amounts were obviously expenses incident to 'carrying on a trade or business.' In return for these payments, the grain dealer was unconditionally obligated to deliver to petitioner the quantity of feed which the amounts received would pay for at the prices in effect on the dates of delivery. There was no condition as to the obligation itself; the only condition was as to the quantum of the obligation. Similar payments for feed to be used in the spring months of the following year were made by petitioner in December of all years subsequent to the taxable years. This practice does not substantiate the statements of counsel for respondent that '[t]hese transactions have no commer-

cial meaning or sense other than as a tax dodge' and 'that to allow such deductions would materially distort petitioner's income.' Indeed, counsel for respondent frankly conceded that although the amounts disallowed in each of the taxable years had not been allowed in any other year, some such adjustments would have to be made in 1949 and the subsequent year in order to prevent the respondent's own action from distorting petitioner's income.

"These circumstances distinguish the instant case from Cravens, 30 T.C. 903.

"Regardless of whether taxpayers are on a cash or accrual basis, the general rule is that deductions are allowable in the year of payment.

"On the record before us, we conclude that the payments here involved were 'ordinary and necessary expenses paid or incurred during the taxable year[s] in carrying on [a] trade or business' and were properly deductible by petitioner in the years of payment under section 23(a) (1) (A) of the Internal Revenue Code of 1939.

\*     \*     \*     \*     \*     \*

"In our opinion the allowance of the deductions taken by petitioner in the taxable years would more clearly reflect his income than their disallowance, and no provision of section 43 of the Internal Revenue Code of 1939 justifies respondent in disallowing such deductions."

The Tenth Circuit, in reversing the Tax Court in the case of Cravens v. Commissioner of Internal Revenue, *supra*, discussed the same question and reached the same result as did the Court in *Ernst*. In *Cravens* the taxpayer paid $50,000 on a contract in 1953 for future delivery of cattle feed which was, in fact, delivered and used in the subsequent year. In reversing the Tax Court which had held the disbursement to be a deposit, rather than payment of an expense which would result in an allow-

able deduction, the Court of Appeals said:

"Under the contract the dates of delivery were not fixed, the prices were to be those prevailing on the dates of delivery, the quantities could have been varied 'to any reasonable extent,' and if the advance payment had exceeded the ultimate cost, Cravens would have been entitled to a refund. These factors are urged as establishing that there was no firm contract of sale and purchase and, hence, no obligation to pay the $50,000 in 1953. The answer is that the contract was binding and carried out by the parties.

\* \* \* \* \* \*

"In the case of farmers and cattle raisers the use of a transactional basis for the computation of income would bring confusion into the federal tax system. The treatment of the cost of seed, fertilizer, and feed purchased in one year for use in the next year is simple if the deduction is allowed when paid if the cash basis applies or when incurred if the accrual basis is used. If each transaction must be analyzed to determine whether a distortion of income will result from the allowance of a business expense deduction, § 43 is, in our opinion, given a meaning which Congress did not intend." 272 F.2d 898, 900.

See also Charles C. and Virginia Miller v. United States (D.C.N.D.Ala.1967).

In Estate of Frank Cohen v. Commissioner, *supra*, the petitioner had entered into two contracts with a commercial cattle producer under the terms of which he purchased cattle which he contracted to feed and sell. One of the contracts required him to purchase feed from the producer to the extent of $6,300 which he paid in advance, whereas the other contract contained no such provision. He was permitted to deduct the $6,300 paid under the former contract whereas he was disallowed such deduction under the latter. In permitting the $6,300 deduction the Court reasoned as follows:

"This brings us to respondent's second contention with regard to the cattle transactions, i. e., that the payments made for feed were in the nature of deposits and not payments and consequently were not deductible in 1960 but when the actual sale was consummated by delivery of the feed.

"For purposes of this contention, it is necessary to consider the two contracts involved separately. Contract 205 KA provides in paragraph 8 for the purchase of $6,300 worth of feed. Both the quantity and quality of the feed are specified in the contract and the amount charged does not include the performance of any services. There is no provision in the contract entitling Frank to a refund of the excess of the amount paid for the feed. He clearly purchased a given tonnage of feed and should any remain unused at the close of the transaction he had the option of selling it to Anderson or anyone else at the prevailing market value. This cannot be said to be the equivalent of a refund. That no portion of the payment was for services is made clear by the provision in the contract for the payment by the owner (Frank) of 8 cents per day per head for handling and service costs.

"These factors clearly distinguish this case from Lillie, 45 T.C. 54 (1965), affirmed per curiam 370 F.2d 562 (C.A.9, 1966). There, on similar facts, the deduction for feed expense was disallowed in the year the funds were delivered to the seller. In that case the Court put great stress on the fact that the payment included future services in the cost of the feed and the fact that sizeable refunds were received by petitioner. As pointed out above, neither of these crucial factors are present with respect to contract 205 KA, and for this reason Lillie is not controlling.

"We conclude that the specificity of the binding contract is sufficient to justify a holding that the $6,300 paid for the feed was exactly that and not

a refundable deposit on feed to be purchased in the future."

The defendant's reliance on Lucas, Commissioner of Internal Revenue v. North Texas Lumber Company, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668 (1930), Shippy v. United States, 308 F.2d 743 (C.A.8, 1962), and Lillie, et ux v. Commissioner, 45 T.C. 54, affd. per curiam, 370 F.2d 562 (C.A.9, 1966), is misplaced.

In *Lucas*, the United States Supreme Court merely held that the title and right of possession with reference to timberlands did not pass until 1917, and thus the seller was not entitled to enter the purchase price as income for the year 1916 and to have tax computed on that basis inasmuch as only an executory contract of sale was created by an option given by the seller to the buyer in 1916 at which time the purchaser declared itself ready to close the transaction and pay the purchase price "as soon as the papers were prepared." They were not prepared or executed until 1917.

The Eighth Circuit in *Shippy* disallowed a claimed expense of the petitioner for the purchase of wet corn or other grain, holding that the partnership did not have a binding contract to purchase this grain, that it did not actually buy it, but only made an advance deposit which would have been refunded upon request; therefore, the disbursement was not an ordinary and necessary expense paid in the year 1957 in the carrying on of its trade or business.

In *Lillie, supra,* the Court, in disallowing a claimed refund distinguished the facts thereof from *Cravens* and *Ernst,* which the Court finds are the same facts distinguishing it from the case sub judice, stated:

"Moreover, while Cravens never received a refund, these petitioners did in essence receive what amounted to substantial refunds in 1961. And, finally, the petitioners' cost of 'feed' included valuable and significant services rendered by both of the cattle-feeding companies. That portion of the cost was nothing more than a deposit for the payment of services to

be supplied in the future. Such an amount is deductible only when the services are performed.

"The facts which distinguish this case from *Ernst* are: (1) Petitioners actually received in 1961 what we regard as a refund for feed not consumed; and (2) the price of 'feed' here included the cost of valuable services to be rendered in the future."

As stated previously, even if it is assumed, for the sake of argument, which the Court finds not to be the case herein, that the sole motive of the plaintiff in timing the payments under the contracts in question was to obtain a tax deduction in the fiscal year ending April 30, 1967, such assumption or concession would not change the result herein, because it is a well settled and long established principle of law that it is the absolute right of any taxpayer to reduce or avoid taxes by legal means available to him. In Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the Supreme Court enunciated this principle:

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 396, 50 S.Ct. 169, 74 L.Ed. 504; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217."

See also Commissioner v. Tower, 327 U.S. 280, 288, 66 S.Ct. 532, 539, 90 L.Ed. 670 (1946); Jones v. Grinnell, 179 F.2d 873 (C.A.10, 1950); Cravens v. Commissioner of Internal Revenue, *supra.*

Although the foregoing authorities sustain the position of the plaintiffs with reference to the issue of their right to refund for payment of the chicken feed, since the defendant strenuously urges that the feed purchased by the plaintiff corporation was not an "ordinary and necessary expense", this Court feels it necessary to discuss in more detail why it rejects this argument of the Govern-

ment. Plaintiff in its Supplementary Brief filed herein has cited two cases which in this Court's opinion amply and adequately deal with the meaning of the words "ordinary and necessary", namely, Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) and Commissioner of Internal Revenue v. Tellier, et ux, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed. 2d 185 (1966). In *Welch*, the United States Supreme Court discussed the words or terms in question in the following language:

"We may asume that the payments to creditors of the Welch Company were necessary for the development of the petitioner's business, at least in the sense that they were appropriate and helpful. McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579. He certainly thought they were, and we should be slow to override his judgment. But the problem is not solved when the payments are characterized as necessary. Many necessary payments are charges upon capital. There is need to determine whether they are both necessary and ordinary. Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms

of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type."

In *Tellier, supra,* the Supreme Court once again dealt with and interpreted the required standard of "ordinary and necessary" as follows:

"The Commissioner also concedes that the respondent's legal expenses were 'ordinary' and 'necessary' expenses within the meaning of § 162 (a). Our decisions have consistently construed the term 'necessary' as imposing only the minimal requirement that the expenses be 'appropriate and helpful' for 'the development of the [taxpayer's] business.' Welch v. Helvering, 290 U.S. 111, 113, 54 S.Ct. 8, 9, 78 L.Ed. 212; Cf. Kornhauser v. United States, supra, 276 U.S. at 152, 48 S.Ct., at 220; Lilly v. Commissioner [of Internal Revenue], 343 U.S. 90, 93–94, 72 S.Ct. 497, 499, 96 L.Ed. 769; Commissioner [of Internal Revenue] v. Heininger, 320 U.S. 467, 471, 64 S.Ct. 249, 252, 88 L.Ed. 171; McCullough v. State of Maryland, 4 Wheat. 316, 413–415, 4 L.Ed. 579. The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset. Welch v. Helvering, supra, 290 U.S., at 113–116, 54 S.Ct., at 8–10. The legal expenses deducted by the respondent were not capital expenditures. They were incurred in his defense against charges of past criminal conduct, not in the acquisition of a capital asset. Our decisions establish that counsel fees comparable to those here involved are ordinary business expenses, even though a 'lawsuit affecting the safety of a business may happen once in a lifetime.' Welch v. Helvering, supra, at 114, 54 S.Ct. at 9. Kornhauser v. United States, supra, 276 U.S., at 152–153, 48 S.Ct., at 220;

cf. Trust of Bingham v. Commissioner [of Internal Revenue], 325 U.S. 365, 376, 65 S.Ct. 1232, 1238, 89 L.Ed. 1970."

██ It would be ludicrous for this Court to doubt for one second that the purchase of the chicken feed ingredients by the plaintiff in its large chicken-producing and interrelated activities was not appropriate and helpful for the development of its business of raising and feeding large flocks of chickens for sale on the market. Certainly this was an ordinary as well as a necessary expense and this Court is not aware of any holding that a deduction has been or should be denied because payment was made for the purchase of such feed, and particularly under the circumstances existent herein, before it was required by contract. Certainly this purchase of feed was not in the nature of a capital expenditure but for the day-by-day supply of food without which the flocks of chickens would not and could not survive. This supply of feed was for only approximately one month in advance, whereas in *Ernst, supra,* the supply purchased and paid for was for six months in advance. In *Cravens, supra,* the Court effectively answered the contention of the Government that the allowance of the deduction would have the effect of distorting income in the following language:

"In the case of farmers and cattle raisers the use of a transactional basis for the computation of income would bring confusion in the federal tax system. The treatment of the cost of seed, fertilizer, and feed purchased in one year for use in the next year is simple if the deduction is allowed when paid if the cash basis applies or when incurred if the accrual basis is used. If each transaction must be analyzed to determine whether a distortion of income will result from the allowance of a business expense deduction, § 43, is, in our opinion, given a meaning which Congress did not intend."

In *Cravens, supra,* the Court stated the following in arriving at the conclusion that the argument of distortion of income urged by the defendant was without merit:

"In Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725, the taxpayer, which was on an accrual basis, deducted certain processing taxes which it had impounded but not paid to the Collector and which were in litigation and later refunded to the taxpayer's customers. The Commissioner disallowed the deduction. The taxpayer contended that the disallowance resulted in a distortion of its income and that under § 43 the Commissioner was required to make an exception to the general rule of accounting periods if it would be unfair not to treat the transaction on the basis of the long-term result. The Court, after commenting on the history of the legislation which resulted in the adoption of the qualifying clause of § 43, said that 'the purpose of inserting the qualifying clause was to take care of fixed liabilities payable in fixed installments over a series of years' and that the intent was not to upset the doctrine that cash receipts and cash payments 'should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer.'

"In the Security Mills case the taxpayer, which was on the accrual basis, had receipts which were offset by a liability which did not accrue until a later year. In the case at bar the taxpayer was on the cash basis and made a disbursement for supplies which were not delivered until a later year. The application of § 43 for the benefit of the taxpayer was denied in the Security Mills case. On the same rea-

soning, the Commissioner is not entitled to the benefit of § 43 in this case."

In view of the foregoing cases and the testimony of *John Ray Gipson*, the certified public accountant who devised plaintiff corporation's bookkeeping system when it was organized in 1959 and who each month reconciles its bank statements posting from the journal to the ledger taking a trial balance and preparing working papers that would reflect profit in each particular month and who also files and analyzes its accounts and prepares its income tax returns each year, that if the plaintiff were required to charge expense of chicken feed as it were delivered or as the chickens consumed it, rather than as it was paid for, this would amount to a "real burdensome type of operation" and that it would not be possible to trace this feed through a perpetual inventory from the time it was purchased until it was delivered to the Breeder Farm and would be inconsistent with the cash method of accounting. This Court agrees with this testimony.

■ Therefore, the plaintiff's claim for refund for the taxes paid on the $228,476.90 expense disallowance for payment of chicken feed during the fiscal year ending April 30, 1967, together with legal interest thereon, is meritorious and will be granted.

The plaintiff, Gaddis Breeder Farms, Inc.'s, second claim for refund in Civil Action No. 4421 is based on its contention that the defendant erroneously refused to permit its deduction of the amount of $11,236.97 as expenses incurred from expenditures made for the purchase of various items or supplies from Shenandoah Equipment Co. of Harrisonburg, Virginia, during its taxable fiscal year ending April 30, 1967 which items are reflected on invoice dated June 4, 1966 and a ledger sheet dated June 15, 1966.[11] More specifically, the plaintiff contends that all of these items were er-

roneously capitalized by the Internal Revenue Service pursuant to the recommendation of its agent who examined the plaintiff's corporate income tax return for the fiscal year ending April 30, 1967 (although the amount of refund claimed by the plaintiff in its complaint is stated as $14,232.81, the parties stipulated at page 33 of the transcript that the Government is correct as to $2,995.84 of the $14,232.81 disallowed expenses leaving the contested amount of $11,236.-97 which is the total of the above invoice and ledger sheet). Plaintiff contends that the items acquired constitute nothing more than supplies having a very short useful life and are therefore not capital expenditures; and also, in the alternative, if it be found that they are capital expenditures, the acquisition simply replaced similar items which had been abandoned after loss of usefulness and credit should be offset against such acquisitions by an abandonment of loss in an equal amount.

As previously stated, these items in question were purchased by Gaddis Feed Mill which was acquired by the plaintiff corporation on December 31, 1966 together with most of its assets and the assumption of all of its liabilities.

On direct examination [12] and cross examination,[13] of Fred L. Gaddis, President and controlling stockholder of plaintiff corporation, the following facts were established. At the times in question, the plaintiff operated 32 company-owned farms, 11 leased farms and 27 contract farms for an average of five cycles per farm per year on the broiler farms requiring the type of equipment in question to be picked up and put down and reassembled five times per year. It is undisputed in the record that with the exception of three incinerators which were purchased from Shenandoah that not one of the items or pieces of equipment purchased from Shenandoah cost more than $8.51 cents each, and accord-

---

11. See Exhibits P–16 and P–17, respectively.

12. Tr. pp. 31–35.

13. Tr. pp. 62–71.

ing to the undisputed testimony of Mr. Gipson, plaintiff's certified public accountant, who has practiced his profession since receiving his Bachelor and Masters degree from Mississippi State in accounting, it is not customary to capitalize any supply or repair item with a cost of less than $8.51 unless such items go into a major construction project. It was established that when and as the new farms were built by the plaintiff prior to the dates of the purchase of all of these items and when these type items had been placed into a new farm this type of equipment was capitalized, but as it was replaced thereafter it was charged as expenses for supplies. According to Mr. Gipson's undisputed testimony, these charged expenses "correctly reflect income".

The testimony of Fred L. Gaddis concerning the purchase of, utilization, and normal lifetime of each of these items in question is undisputed in this record, and therefore this Court finds in accordance with this undisputed testimony that each of these items constituted expendable supplies rather than capital expenditures.

The general rule is that the cost of items which have a useful life of one year or less are currently deductible, whereas items with a useful life or more than one year must be capitalized and the cost thereof recouped through annual depreciation deduction, all of which Mr. Gaddis admitted that he was aware of.[14] Section 263 of the Internal Revenue Title prohibits the deduction of amounts paid for new buildings, or for permanent improvements or betterments made to increase the value of any property or estate, and the taxpayer is permitted under § 167 of the same Title to recover the cost of such items through annual depreciation deductions.

The criteria for distinguishing between a deductible expense item and one which is capital in nature are set forth in Treasury Regulations 1.162–4 in the following language:

"The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept."

None of these items purchased by the plaintiff from Shenandoah had the effect of arresting deterioration or appreciably prolonging the life of the property nor did they result in an increase in the value thereof. None of them were utilized to entirely refurbish any of the chicken houses in question nor were they used to equip any new chicken houses, but were merely placed or distributed throughout the various chicken houses to replace similar items which through wear and tear and normal usage had become no longer economically feasible or useful. The expenditures involved here did nothing more than maintain the property in its ordinary operating condition, and with the exception of the incinerator, each, including the watering troughs, hanging feeders, hoses, valves, egg baskets, piping, nests, accessory packs, etc., ranged in price from $1.60 to $8.50 and had a normal useful life not in excess of 12 months, and were therefore deductible as expenses.

In Libby & Blouin, Ltd. v. Comm., 4 B.T.A. 910 (1926), the Commissioner of Internal Revenue unsuccessfully attempted to require capitalization of

---

14.  Treasury Regulations on Income Tax (1954 Code), § 1.263(a).

numerous small parts used as replacements for similar items in a locomotive. The Court held:

> "When a building is erected the flooring, nails and other small supplies of course enter into the capital cost of the building, yet when a building is repaired, the cost of replacing planks in the floor, and the cost of nails in making repairs, while it might be a considerable item, is entirely different from the ordinary cost of such things when the building is being erected. As in the case of the locomotive involved in this appeal, expenditures to replace certain worn out parts, as worn out tubes, broken parts, wheels, etc., merely keep the machine in operating condition. The statute contemplates that assets used in a trade or business are to be kept in an efficient operating condition by repairs, and money expended in making such repairs is considered an expense and allowed as a deduction by the statute."

█ Therefore, based on the undisputed evidence in this record and the foregoing authority, this Court finds and is of the opinion that the plaintiff was entitled to treat the items purchased from Shenandoah as expendable supplies and the defendant erroneously and illegally considered them capital expenditures. Thus, the plaintiff is entitled to the claimed refund of taxes paid as a result of this disallowance.

The final issue to be decided is whether the Internal Revenue Service was justified in imposing upon the plaintiff the 5% negligence penalty in the amount of $7,442.17 for the fiscal year ending April 30, 1967 pursuant to the provisions of Title 26, U.S.C. § 6653, which permits the imposition of this penalty where the underpayment of income taxes is due to negligence or intentional disregard of rules and regulations, but without intent to defraud. The Commissioner determined that the corporate plaintiff underpaid its federal income tax for the fiscal year in question, and that at least a part of the underpayment was due to either negligence or intentional disregard of applicable rules and regulations.

Gaddis Breeder Farms was a large, growing corporation which as already stated operated 32 company-owned farms, 11 leased farms, and 27 contract farms, and which covered thousands of acres, producing 350 flocks of chickens per year, or a total of 12 to 13 million broilers per year. The volume of its sales during the fiscal year ending April 30, 1967 amounted to $5,909,654.63 and the volume of its purchase for that year was $4,830,507.44. It was one of several corporations which were being operated under the trade name of Gaddis Industries and although it was being managed by Taylor Gaddis, brother of Fred L. Gaddis, nevertheless Fred L. Gaddis was its President and controlling stockholder. This plaintiff corporation employed a large number of employees including a full-time bookkeeper who maintained a complete double entry set of records to account for its revenues and expenses. Its bookkeeping system was set up at the time that it was organized in 1959 by John Ray Gipson, who received his Bachelor and Masters degree from Mississippi State and has actively practiced as a certified public accountant since 1953. Each month Mr. Gipson visited the plaintiff's office, reconciled its bank statements and posted from its journal to its ledger. He would take a trial balance and from this trial balance prepare working papers that would reflect the profit for that particular month. At the end of each fiscal year he would analyze all of the accounts of the corporation that he deemed necessary and would then prepare its income tax returns. Gipson was the only one who had ever prepared a tax return for the plaintiff corporation, and to his knowledge, no information has ever been withheld from him by anyone, including Mr. Fred L. Gaddis who was neither an accountant nor a lawyer. It was his opinion that the correct income of the company was ascertainable from the books and records which were kept. No income has been

shown or alleged to have been omitted from the records thus maintained or from the tax return prepared by the certified public accountant on whose expertise the plaintiff through its president and controlling stockholder always relied.

In January, 1967, Mr. Louis Butler of the Internal Revenue Service audited plaintiff's books and records for the fiscal years 1964-1965 and 1965-1966 as well as its Federal Tax Returns for those two years. This audit was completed approximately three months prior to the end of the April 30, 1967 fiscal year which is the year in question. Several errors or omissions were called to the attention of Mr. Gipson by Mr. Butler with reference to the above fiscal years, and particularly certain large items which had been deducted as expenses which should properly have been capitalized. These items had been credited to purchases, including the purchase of some livestock. Also, a note receivable in the amount of $150,000 had been mistakenly entered as a purchase.

The R.A.R. (Revenue Agent's Report) [15] was reviewed by the certified public accountant, Gipson, who agreed with all adjustments made therein by Butler in January, 1967 some three months prior to the end of the April 30, 1967 fiscal year. After this discussion with Mr. Butler, Mr. Gipson contacted Mrs. Thompson, the plaintiff's regular bookkeeper, pointed out to her the mistakes that had been made and called to his attention by Mr. Butler, and in turn Gipson made suggestions to Mrs. Thompson with reference to more accurate bookkeeping at which time he and Mrs. Thompson went back into the corporation's books and checked them as best they possibly could, including the records for the fiscal year in question, pulling some expense items out which had been improperly entered as such.

Gipson's first contact with Mr. Frank Price of the Internal Revenue Service who audited the books and tax return of the plaintiff corporation for the fiscal year ending April 30, 1967, was in approximately January, 1968 when he agreed with several substantial adjustments made by Mr. Price in his R.A.R. [16] with the exception of the items now in question before this Court. Page 12 of Exhibit "A" to Exhibit D-5 shows above the double lines thereon the expenses which had been claimed and below the double lines their corrected entry as capitalized items, including cost of pipe fencing and labor, a large cattle purchase, expense of hauling cattle and some other labor expenses. Gipson did not set up a capital account for labor but just for equipment and buildings, and he has never audited the plaintiff's books but merely made the tax returns and performed the monthly services previously referred to. It was his job and prerogative to examine the classification of expenses as he wished and feels that he should have in order to correctly prepare the plaintiff's tax returns. No one connected with the plaintiff corporation has ever withheld any information from Gipson, and he has been given free access to all the books of the corporation, which system he initially set up in 1959 and over which he had monthly supervisory capacity as well as the duty of making tax returns each year subsequent to that time. He did testify that he did not have the time to, nor did he ever request to check every invoice of plaintiff's large and growing business. Mr. Gaddis and the other stockholders relied upon his expertise in the preparation of the plaintiff's tax returns, including the one in question for the fiscal year ending April 30, 1967.

In United States v. Miller, 315 F.2d 354 (C.A.10, 1963), cert. den. 375 U.S. 824, 84 S.Ct. 64, 11 L.Ed.2d 57 (1963), affg. 211 F.Supp. 758 (D.Wyo.1962), the Court, although primarily concerned with the delinquency and negligence penalties for failure to file a tax return, did state the determinative criteria to be the standard of ordinary business care

---

15. Exhibit D-4.

16. Exhibit D-5.

and prudence. In *Miller,* the Court recognized that the taxpayers were not indifferent to their obligations under the tax laws as shown by the consistency with which they referred all their income tax problems to qualified parties and noted that they employed and relied on the expert knowledge of a specialist in tax law for the preparation of their returns which was in itself evidence of their care and attention to their duties under the income tax laws.

In Woodbury v. Commissioner, 49 T.C. 180 (1967), the Tax Court also found that petitioners' reliance on attorneys or accountants for the preparation of their income tax returns indicated their good faith and evidenced due care for their obligations under the income tax laws and thus no part of the deficiencies in question was due their negligence or their intentional disregard for the rules and regulations. Additionally, in *Woodbury* the Court referred to Income Tax Regulations, Section 1.6001–1(b) in support of the proposition that farmers need not keep the complete records required of other taxpayers, but they are required to keep "such records as will enable the District Director to determine the correct amount of income subject to the tax."

Although more care could have been exercised by the plaintiff's bookkeeper and by its certified public accountant in maintaining the plaintiff's records and in checking and double checking each entry made, nevertheless the taxpayer employed a regular bookkeeper and certified public accountant, gave them all necessary data and records of financial transactions which were maintained, and no income was omitted from the tax returns. Furthermore, the plaintiff employed a certified public accountant to prepare its income tax returns each year. Under all the facts and circumstances of this case this Court finds that the evidence preponderates in favor of the plaintiff's position that it was not negligent nor did it intentionally disregard the rules and regulations within the meaning of § 6653(a).

Therefore, this Court finds and is of the opinion that the preponderance of the evidence shows that the plaintiff herein exercised reasonable care and was not guilty of negligence or intentional disregard of the rules and regulations and should not have been assessed this penalty. Therefore, it is entitled to a refund thereof.

Accordingly, separate Judgments conforming with the foregoing Findings of Fact based on a preponderance of the evidence and the Conclusions of Law shall be prepared by the plaintiffs in each of the above styled and numbered cases, be approved as to form by counsel for both sides, and be presented to the Court at Biloxi, Mississippi in the form and within the five days required by the Rules of this Court.