MISSISSIPPI STATE TAX COMMISSION *v.*
COLUMBIA GULF TRANSMISSION COMPANY

No. 42895          February 24, 1964          161 So. 2d 173

*John E. Stone,* Jackson, for appellants.

*Keady, Campbell & DeLong,* Greenville, for appellee.

ETHRIDGE, J.

Columbia Gulf Transmission Company, appellee, (called Columbia Gulf), operates an interstate pipelines system and facilities transporting natural gas from fields in the State of Louisiana through Mississippi, Tennessee and Kentucky, terminating at the Kentucky-West Virginia state line. It is exclusively in interstate commerce through this state, in which it has three compressor stations, which maintain pressure in the pipeline for the continued transmission of natural gas.

This case involves the question of whether Columbia Gulf is exempt by statute from the Mississippi use tax, for the natural gas used and consumed from its pipeline as fuel to operate its compressor stations in this state. The State Tax Commission assessed Columbia Gulf with use taxes in the amount of $29,562.10, asserted to be owing for the period January 1, 1959 through April 30, 1961. It paid under protest, and brought this suit in the Chancery Court of the First Judicial District of Hinds County to recover the tax. Miss. Code 1942, Rec., § 10146-12. The chancery court held that the statute exempted this particular use of Columbia Gulf's gas, and ordered the tax refunded. The commission and its chairman have appealed from that decree.

Mississippi Laws 1960, chapter 479 in part is entitled "An Act . . . To Exempt Natural Gas Imported and Used by a Pipeline as Fuel." Section 4 provides:

"Exemptions. The tax levied by this Act shall not be collected in the following instances: . . . (h) on the use of natural gas owned and consumed by a pipeline from its own lines as fuel to operate compressor stations and other facilities necessary to the marketing of the gas." Miss. Code 1942, Rec., § 10146-04(h).

The sole question is whether, under the facts hereafter stated, this statute exempts from the Mississippi Use Tax the use of natural gas by Columbia Gulf which was obtained from its own lines and used as fuel to operate its compressor stations and other facilities necessary to the marketing of the gas. The controversy pertains to application of the word "owned" as used in section 4(h). Columbia Gulf consumes gas obtained from its own lines. It is used as fuel to operate compressor stations and other facilities, which are necessary to the marketing of the gas.

I.

We also think that Columbia Gulf became the owner of the gas to be used for company purposes when it was received into its pipeline in Louisiana; all incidents of a completed sale were present; and therefore appellee "owned" the gas which it consumed from its own lines as fuel.

Both parties stipulated that the commission has granted to all other natural gas companies, excepting only Columbia Gulf, an exemption from use tax on all of the natural gas used and consumed to operate compressor stations in Mississippi which serve the pipeline facilities of these nine pipeline companies. The only reason the present exemption was not granted to Columbia Gulf "was the conclusion reached by defendants that complainant did not own the natural gas it con-

sumed to operate its compressor stations in Mississippi at the time such gas was imported into the state."

The purpose of Columbia Gulf's pipeline system is to transport from the Gulf Coast of Louisiana to Kentucky volumes of gas for United Fuel Gas Company (called United Fuel). Both companies are wholly owned subsidiaries of Columbia Gas System, Inc. Both operate under gas tariffs, filed and approved by the Federal Power Commission, which also approved a service agreement between them.

Under the service agreement, Columbia Gulf agreed to receive, transport and deliver to United Fuel all quantities of natural gas made available for delivery into its facilities for the account of United Fuel, but Columbia Gulf "shall not be obligated to deliver to owner (United Fuel) gas used for fuel, other company purposes . . ." The gas is tendered to Columbia Gulf at the points of receipt in Louisiana by United Fuel at a pressure sufficient to cause the gas to enter the pipeline at the points of receipt. United Fuel agreed to dedicate and set aside designated gas reserves to enable Columbia Gulf to operate its facilities and perform the transportation services. Under Article 5, United Fuel agreed to furnish gas to Columbia Gulf "for fuel and other company uses," and Columbia Gulf "will each month pay at the weighted average price paid by United Fuel for such gas used for fuel and other company uses during such month."

Under the general terms and conditions of the gas tariff, Columbia Gulf receives all gas "on the outlet side of the measuring station where gas is received," which is in Louisiana, and the point of delivery is "on the outlet side of the measuring station where gas is delivered" to United Fuel, in Kentucky. Columbia Gulf "shall be deemed to be in control and possession of the gas deliverable hereunder from the time that such gas is received by it at the points of receipt . . . until

such gas shall have been delivered . . . at the points of delivery." United Fuel "shall have no responsibility with respect to any gas hereunder until it is delivered or on account of anything which may be done, happen, or arise with respect to said gas before such delivery." Columbia Gulf "warrants title to all gas delivered by it to" United Fuel, and "that such gas is free and clear from all liens or adverse claims." It further agreed to install and operate measuring stations equipped with meters by which the volumes of gas received and delivered shall be determined.

There were some 43 natural gas fields in southern Louisiana which provided between 63 to 73 measuring stations, from which appellee took gas into its system from various producers. The total volume of gas daily delivered to the pipeline is recorded at these measuring stations, operated by appellee. It is measured again as it leaves appellee's system at points of delivery. The difference between the volume of gas entering the system at points of receipt, and the volume of gas delivered to United Fuel for operating its compressor stations and other related facilities. Each month, United Fuel settled with Columbia Gulf for the transportation services rendered, the charge for which was based upon costs of operation and maintenance. From that was deducted the dollar amount representing the gas used by Columbia Gulf for compressor station fuel and other company uses. Columbia Gulf was paid the net amount or difference between the total cost of service and the amount representing gas purchased by it from United Fuel for company uses. The gas was purchased from United Fuel in the state of Louisiana. The purchase price which was paid United Fuel for this compressor fuel was the same average price which the latter paid to the Louisiana producers.

United Fuel is interested only in the total volume of gas which appellee purchases from it each month.

It is significant that appellee was a party to about 50 percent of the gas purchase contracts made by United Fuel with natural gas producers. It sells gas from its pipeline to tap rice farmers in Louisiana. This is considered a company use of gas and is included in the purchases appellee makes from United Fuel. Appellee determines in advance of actual handling, to a degree of accuracy within 2 percent, the volumes of gas needed to deliver customer orders in Kentucky, and also to operate its system. This is done by several means. There are long-range, monthly, and daily gas purchase requirements. Upon notification by United Fuel as to volume delivery orders, appellee determines what amount of company-use fuel will be needed to meet such volume obligations. In accord with gas purchase requirements developed in this manner, appellee notifies United Fuel how much gas is projected to be purchased by it from United Fuel in Louisiana. These calculations result in the total amount of gas needed to be purchased by appellee in order to effect delivery of volume orders placed by United Fuel.

After such projections, appellee receives the actual delivery orders from United Fuel, monthly and subject to daily change. Thus each day a volume order is in existence on which appellee maintains a daily record. The daily log results in substantial accuracy, within 2 percent of actual usage, which is the tolerance allowed for metering equipment. The variance between projected use and actual use of compressor station fuel is inconsequential. Appellee has a gas control center at Houston, Texas, from which its operatives control the flow of gas at all points of receipt and delivery. They telephone gas orders to the individual producers, after having determined daily the customer's requirements and the company's needs.

After the gas enters the pipeline, it moves continuously in its flow and never stops. The transportation of

gas through the system could not be accomplished without use of compressor stations, and the sole source of gas to operate them is from appellee's pipeline. Besides appellee, there are ten other interstate natural gas pipelines regulated by the FPC which operate in Mississippi. Nine of them run their compressor stations with gas from their lines. The commission exempts them from the use tax, on the ground that they own all of the gas in their pipelines.

## II.

At the time gas is taken into appellee's system in southern Louisiana, the amount purchased for company use is ascertained and determined as accurately and definitely as it is humanly possible to do. The only way of actually measuring the amount of gas used for company purposes is by meter measurement, which is 98 percent accurate. At the time the gas is delivered to appellee in southern Louisiana, the amount purchased by it for company use has been actually determined by projection, estimate and experience to within the same degree of accuracy which meters could provide.

■■ ■ Although it is said generally that exemption statutes are strictly construed, a corollary rule of interpretation is that full force and effect will be given to the terms of an exemption statute, without engrafting qualifications or limitations not stated in the act. ■■■ The legislative intent is the objective, and words used in a statute are given their plain, usual and ordinary meaning.

The exemption provision of section 4(h) manifests an intent to grant an exemption to only a particular portion of gas, namely, such part as the pipeline company uses and consumes as fuel to operate its compressor stations and other necessary facilities. Further, there is no requirement that all of the natural gas in the pipeline be owned by the pipeline company in order

to entitle it to use tax exemption on that part used as compressor station fuel. The commission would in effect add to the statute a proviso that the company must own all of the gas transported through its pipeline. Yet the statute does not so state.

■■■ The legislative purpose was to exempt natural gas brought into the state, and not purchased here, which is used as fuel to operate compressor stations. The title to the act states that it is one "to exempt natural gas imported and used by a pipeline as fuel." Its apparent purpose was to encourage the development and operation of interstate pipelines within this state, including the construction and maintenance of compressor stations. In this case appellee both imported into the state and, we think, owned the gas which it used to operate its compressor stations.

■■■ Construing a Mississippi tax statute, we seek the legislative purpose. This is not an action between Columbia Gulf and United Fuel to determine their respective rights under a contract made in Louisiana. The issue is whether the statute has the effect of exempting the gas used by the taxpayer under the present circumstances. However, assuming Louisiana law applies in determining whether there was a completed sale of company-used gas in Louisiana, we think the title passed to appellee through a completed sale in that state. The time when title passes under a contract depends upon the intention of the parties. California Fruit Exchange v. John Meyer, Inc., 166 La. 9, 116 So. 575 (1928); D. Kelham & Co. v. Carroll, 20 La. Ann. 111 (1868). The service agreement and the tariff manifest the intent of United Fuel and Columbia Gulf to complete the sale of gas for company uses at the point of receipt in Louisiana. Actual measurement of the volume of such company gas at the time of intake into the pipeline was made. It was then at the risk of appellee until delivered to United Fuel in Kentucky. In short, there was a

completed delivery of the goods and acceptance of delivery.

Further, the parties expressly placed the risk upon appellee from the moment the gas for company use entered its pipeline. The price of company gas was capable of being ascertained by computation from known facts. There was sufficient definiteness of price. There was an immediate full delivery to the buyer at points of receipt in Louisiana, and its acceptance. Appellee then became charged with responsibility for the gas. It paid for the gas which it purchased, being all portions of it not delivered to United Fuel in Kentucky.

██ █ Edgwood v. Falkenhagen, 151 La. 1072, 92 So. 703 (1922), holds that any act indicating a definite intention to appropriate goods to a contract to sell is sufficient, and, where such act is assented to by the parties, the property at once passes to the buyer, who thereupon owns it. Here all factual indicia support a transfer of title to the company gas in Louisiana. The service agreement and the tariff manifest that intent. The record reflects it was actually carried out in operations under the contract.

Accordingly, since intent is the controlling factor, the general rule pertaining to transfers of property as to constituents of a mass, uniform and alike, are applicable. ██ █ In a sale of personal property which is part of a specific mass involving identical units, title to the part sold may pass upon delivery, apart from any separation or segregation of the portion sold from the part not sold, provided the parties so intend. Although the goods sold have not been separated from the mass, the property in them will pass if such is the intention of the parties. ██ █ If the buyer is allowed to take possession of the whole for the purpose of enabling him to separate the part sold, the title to that part passes to the buyer. 77 C.J.S., Sales, § 253; 46

Am. Jur., Sales, § 429; United States v. Amalgamated Sugar Co., 72 F. 2d 755 (C.A. 10th, 1934).

■ ■ The term "fungible goods" defines goods of which each particle is identical with every other particle, such as grain and oil. 1 Williston, Sales (rev. ed. 1948), §§ 155-159. This right of the several owners, to separate ownerships of fungible goods, is the subject of sale. ■ ■ Ownership by several persons may exist in property of an undetermined amount, confused in one mass, even though "the aliquot share of each owner can be determined only by the measurement of the whole mass." Ibid., § 155.

■ ■ In the instant case, the physical delivery in Louisiana of that portion of the gas ordered for fuel and other company uses of Columbia Gulf was a delivery for the purposes of sale and use, and not a delivery only for transportation. The service agreement and tariff expressly so stated. Delivery of a commodity to a buyer is, in itself, the strongest manifestation that title to property thereupon passes, particularly in a credit transaction as in this instance. 77 C.J.S., Sales, § 251. All of the incidents of a completed sale in Louisiana are present, with respect to the gas consumed by appellee from its pipeline in operating compressor stations in this state. It has sole dominion and control of the gas, as well as its possession. United Fuel has no interest in such gas, except to be paid for it. In appropriating and consuming the gas at its compressor stations, appellee acts as the lawful owner. ■ ■ Hence we conclude that appellee owned the gas which it consumed in its compressor stations and which was taken from its own pipeline. Accordingly, we do not reach the supplemental question of whether appellee had such a substantial beneficial interest in the gas when taken into its pipeline in Louisiana as to make it an owner within the usual and ordinary, rather than technical meaning of the word "owned." See Azwell

v. Mohamed, 164 Miss. 80, 143 So. 863 (1932); Thompson v. Kreutzer, 112 Miss. 165, 72 So. 891 (1916).

Somewhat analogous to the instant problem are those cases holding that oil and gas division orders constitute a continuing offer to sell, and that such products when run into the pipeline pursuant to the division order becomes the buyer's property as soon as it is received into the pipeline. Each day the oil run into the pipeline becomes a completed sale. See Bonds, Division Orders, Fifth Annual Institute on Oil and Gas Law and Taxation, Southwestern Legal Foundation (1954) 91; Ethridge, Oil and Gas Division Orders, 19 Miss. L.J. 127 (1948).

Affirmed.

*Kyle, P. J., and Gillespie, Brady and Patterson, JJ.,* concur.