481 So.2d 306 (1985)
Adam Lee PINKTON
v.
STATE of Mississippi.
No. 55806.
Supreme Court of Mississippi.
November 27, 1985.
*307 Boyd P. Atkinson and Raymond L. Wong, Cleveland, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by William S. Boyd, III and Marvin L. White, Jr., Sp. Asst. Attys. Gen., Jackson, for appellee.
En Banc.
ANDERSON, Justice, for the Court:
Adam Lee Pinkton pled guilty to capital murder in the Circuit Court of Bolivar County and was sentenced to die. Mississippi's capital murder statute requires, as a prerequisite to the imposition of the death penalty, a specific written finding by the jury relating to the defendant's actions and intent. Pinkton's appeal presents us with the question of whether the law requires such a finding in the sentencing phase of a bifurcated trial, even where the defendant pled guilty in the first phase. We hold that it does, and we reverse.

FACTS
At the time of his offense, Adam Lee Pinkton was twenty-one years of age, unemployed, lacking any place to stay[1], and depressed over his generally bleak prospects. He resorted to desperate measures. On December 30, 1983, he broke into the house of his sister's boyfriend and took a .12 gauge shotgun and three shells. He then set out on foot for the nearby hamlet of Deeson, where the Deeson Cash Store was located. While en route, he fired the shotgun into the air to see whether it was working. This attracted the attention of Jerry Gomillia, an acquaintance; Pinkton warned Gomillia not to tell anyone that he had the gun. Just outside the store, he encountered two other friends, Robert Lewis and James Selby. He informed Lewis of his intent to rob the store. He told Selby that he intended to shoot the store's owner, but Selby seems to have assumed that this was said in jest.
Inside the store were the proprietor, Louis Coats, and his son Henry. The store normally closed at 6:15 p.m., but on that particular day (a Friday) business was slow, and at about 6 o'clock Henry suggested that they close the store a few minutes early and go home. Since the regular closing time was only a few minutes off anyway, Louis Coats elected to stay and keep the store open  a seemingly unremarkable decision which would have tragic consequences.
The last paying customer left the store about 6:10. Shortly afterwards, Henry Coats saw Adam Lee Pinkton approaching the store with a shotgun. This caused him no particular alarm, since the elder Coats also functioned as a pawnbroker and frequently accepted such articles. Moreover, the Coatses knew and trusted Pinkton; indeed, at one time he had worked at the store.
Pinkton asked Henry whether Mr. Coats would be interested in the gun and received a favorable response. But as Louis Coats approached for a closer look, Pinkton abruptly turned the gun on the two and ordered them to raise their hands and go to the back of the store. Henry turned around to comply; Mr. Coats was behind the counter at the time. Suddenly, Pinkton fired the shotgun directly at the storekeeper. Louis Coats died instantly as the blast tore away the top of his head; Pinkton then turned toward Henry, who had dropped to the floor, and fired again, wounding the young man's hand and grazing his head. Having run out of shells, he *308 then beat Henry with the butt of the shotgun until he grew fatigued. Henry then was able to push him off, and ran to the back of the store seeking a weapon of his own. At this juncture, Pinkton fled the premises, leaving the shotgun behind and taking no money. He crossed the road onto an adjacent field and climbed into a barn. From that vantage point he watched as police quickly converged upon the store in answer to Henry's call. Pinkton then made his way to his sister's property, where he hid in the outhouse. Inevitably, Bolivar County authorities came to his sister's place in search of him, and he saw their approach. Apparently deciding that further flight would be futile, he came out of the outhouse and gave himself up, spontaneously telling a deputy that he had killed Coats. Some three hours after being taken into custody, Pinkton gave the county authorities a detailed confession in which he said that he had set out to kill both Coats and his son, adding that he had been drinking that day. The trial judge found that this confession had been freely and voluntarily given, and it was received as evidence in the sentencing phase of the trial.
On April 2, 1984, Pinkton appeared in the Circuit Court of Bolivar County and entered a plea of guilty to the charge of capital murder. The trial judge conducted a hearing on the plea, found that it was knowingly and intelligently made, and accepted it. The sentencing phase of the bifurcated trial commenced a week later. During this phase of the trial, Pinkton argued that he acted in self-defense since Coats had been reaching for a gun behind the counter. This story did not convince the jury, which at the close of its deliberations, announced that it had found the following aggravating circumstances beyond a reasonable doubt:
1. The capital murder was committed while the defendant was engaged in an attempt to commit the crime of armed robbery.
2. The capital offense was committed by a person under sentence of imprisonment.[2]
3. The capital offense was committed for pecuniary gain.
4. The capital offense was committed for the purpose of avoiding or preventing a lawful arrest.
The jury further found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances (which were not enumerated) and that Adam Pinkton must therefore suffer death for his crime.

LAW
As in any case involving the ultimate sanction of law, we approach this appeal with enhanced awareness of our awesome responsibility. It has been truly said that
[t]he penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. (Furman v. Georgia, 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346, 388 (1972), Stewart, J., concurring.)
Because of the terrible character of this penalty, we have long taken a different approach in reviewing capital cases. In such matters, we employ a higher level of scrutiny. Jones v. State, 461 So.2d 686, 690 (Miss. 1984). "What may be harmless error in a case with less at stake becomes reversible error when the penalty is death." Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978). When a defendant's life is in the balance, patience with the normal imperfections of the criminal justice system ceases to be a virtue. See also, e.g. Billiot v. State, 454 So.2d 445, 455 (Miss. 1984); Neal v. State, 451 So.2d 743, 750 (Miss. 1984); Williams v. State, 445 So.2d 798, 810-11 *309 (Miss. 1984); Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982).
The law most crucial to this appeal is a part of our revised death penalty statute  specifically, Mississippi Code Annotated, Section 99-19-101(7) (Supp. 1984). That subsection reads:
7. In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) The defendant actually killed;
(b) The defendant attempted to kill;
(c) The defendant intended that a killing take place;
(d) The defendant contemplated that lethal force would be employed.
It is uncontradicted that the jury in the present case failed to make a separate finding. Rather, it embarked directly upon the framing of findings relating to the aggravating circumstances. The question is whether such an explicit finding is indispensible or whether it can be implied from the other findings or from the plea of guilty in the guilt phase.
At the outset, it is proper to note that our decision is controlled by this statute and not by federal constitutional considerations. The state has been at great pains to show that Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and the numerous lower federal court decisions forming a gloss upon it do not impose a constitutional requirement for a separate finding of an intent to kill, at least in cases where jury instructions cured the omission or where, under the circumstances, the jury could not logically have found as it did without previously positing an intent to kill. The state here argues that since it is "obvious" that MCA § 99-19-101(7) was enacted because of Enmund, (appellee's br. p. 7), this Court should not apply more stringent requirements than those present in the federal system, from which Enmund emerged.
This argument runs afoul of some basic facts about American federalism. Assuming, for the sake of the argument, that the state's interpretation of Enmund and its progeny is perfectly sound, it does not itself dispose of the problem before us. The Constitution of the United States may not impose the requirement of a written finding, but it does not follow that our statute does not. Where Mississippi law furnishes an independent basis for our judgment, we need not be bound by federal precedents; though of course, we may refer to them for guidance and illumination. Cannaday v. State, 455 So.2d 713, 722, (Miss. 1984). Even if we were convinced that Enmund was the "obvious" reason for the enactment of MCA § 99-19-101(7), (a question we need not resolve here), we would be bound by the terms of the statute, for that is the vehicle the legislature chose for responding to Enmund.
It is elementary that in applying a statute, this Court will look first to that statute's own words. Back-Acres Country Club, Inc. v. Miss. State Tax Comm'n, 216 So.2d 531, 534, (Miss. 1968); Russell v. State, 231 Miss. 176, 181, 94 So.2d 916, 197 (1957). In the present case, there is no occasion to employ arcane rules of construction, for these are appropriate only where the words of the statute are ambiguous. Clark v. State, ex. rel. Miss. State Medical Ass'n, 381 So.2d 1046, 1048 (Miss. 1980); Miss. Power Co. v. Jones, 369 So.2d 1381, 1388 (Miss. 1979). There is no ambiguity whatsoever in MCA § 99-19-101(7). It clearly states that the jury "must" make a written finding that one or more of these circumstances existed before imposing the death sentence.
The state points out that Pinkton was indicted as the sole participant in the murder, that he pled guilty to the charge, that both he and his counsel at trial admitted that he planned the killing, and that the jury did make a finding that the killing was committed for pecuniary gain, which logically subsumes a finding of intent. All of this is very true, and we would find the arguments tempting, if we thought that courts may, in the presence of an egregious set of facts, ignore the plain wording of a statute. That, however, is not our understanding *310 of our role. If the legislature thought it proper for us to imply a § 99-19-101(7) finding from other findings or from circumstances in the case, it is hard to explain why they required the jury to make a separate finding at all, let alone a written finding. Laws should be construed so as to give effect to all of their provisions, so far as that is possible. Miss. Public Service Comm'n v. City of Jackson, 328 So.2d 656, 658 (Miss. 1976); Morgan v. State, ex rel., District Attorney, 208 Miss. 185, 197, 44 So.2d 45, 49 (1950); State v. Russell, 185 Miss. 13, 21, 187 So. 540, 542 (1939). If we followed the state's suggestion in this matter, it would have the effect of reducing the subsection to mere surplusage. We decline to do this. It is our settled practice to interpret words in a statute according to their ordinary and usual meaning. Pearl River Valley Water Supply Dist. v. Hinds County, 445 So.2d 1330, 1334 (Miss. 1984); Entrican v. King, 289 So.2d 913, 917 (Miss. 1974); Miss. State Tax Commission v. Columbia Gulf Transmission Co., 249 Miss. 88, 99, 161 So.2d 173, 177 (1964). In keeping with this practice, we hold that the word "must" in § 99-19-101(7) means what it says. A separate, explicit and written jury finding in accordance with the subsection is indispensable to the valid imposition of the death penalty.
The state argues, in the alternative, that Pinkton is procedurally barred from raising this issue on appeal, since there was no contemporaneous objection to the judge's failure to instruct the jury on the requirement for a § 99-19-101(7) finding. This argument is without merit. Although a more complete instruction might have prevented the jury's omission, that omission is nonetheless an event legally distinct from the judge's failure to instruct. The jury's obligation in this matter is, after all, independently imposed by the statute without reference to any action by the judge. Once this is understood, the state's argument immediately falls. Pinkton could raise no objection to the jury's dereliction until after its verdict was rendered, and then it was too late.
Our holding today is compelled by the plain provisions of our statute. We think, moreover, that a contrary result would be inconsistent with our established policy of emphasizing the tremendous gravity of any matter involving the death penalty. It is our duty to be mindful of this even (and perhaps especially) in cases involving unusually brutal or senseless crimes. Where the state fails to carry any part of the burden allotted to it by law, it need not hope for our indulgence. There will be no short cuts to the execution chamber while this Court sits.
Because we are reversing on this issue, it is not necessary for us to discuss the other assignments of error.
REVERSED AND REMANDED AS TO THE SENTENCING PHASE.
PATTERSON, C.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
ROY NOBLE LEE and WALKER, P. JJ., dissent.
ROY NOBLE LEE, Presiding Justice, dissenting:
I think the majority opinion has gone far afield and missed the mark in construing Mississippi Code Annotated § 99-19-101(7) (Supp. 1984), and in failing to recognize the intent of the Mississippi State Legislature when amending the section. Therefore, I dissent from that opinion.
Section 99-19-101(7) was enacted by the legislature in response to Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In Enmund, an individual and a co-defendant were found guilty of robbery and murder of two elderly persons and were sentenced to death by a Florida court. The Supreme Court of Florida affirmed the death sentence of Enmund, holding that, even though the record supported no more than the inference Enmund was in a car by the side of the road at the time of the killings, waiting to help the robbers (the co-defendant and another) escape, this was enough under Florida law *311 to make the defendant Enmund a constructive aider and abetter and, hence, a principal in first degree murder, upon whom the death penalty could be imposed. The court expressly rejected the defendant's argument that, because the evidence did not establish he intended to take life, the death penalty was barred by the Eighth Amendment.
On certiorari, the United States Supreme Court reversed and remanded, holding that the Eighth and Fourteenth Amendments were violated by the imposition of the death penalty on the defendant, who aided and abetted a felony in the course of which a felony was committed by others, but who did not himself kill, attempt to kill, intend to kill, or contemplate that life would be taken.
Section 99-19-101(7) provides:
7. In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) The defendant actually killed;
(b) The defendant attempted to kill;
(c) The defendant intended that a killing take place;
(d) The defendant contemplated that lethal force would be employed.
Unlike Enmund, the appellant here, Pinkton, was the sole participant in the murder of Louis V. Coats, and the indictment charged that Pinkton did "unlawfully, wilfully, feloniously, ... and with a deliberate design to effect death did kill and murder Louis V. Coats... ." Appellant pled guilty to the indictment and specifically acknowledged that he understood he was pleading guilty to committing the homicide "with a deliberate design to effect the death of Mr. Coats" and that he committed the murder.
Just prior to entering the store, appellant passed two individuals while armed with a shotgun and told them he was going into the store to rob Coats and that he was going to kill him. He entered the store alone, pointed the shotgun at Coats and his son, told them that "This was a robbery" and then shot Louis V. Coats' head off. Appellant fled, concealed himself and watched from a distance while the officers arrived at the scene. Then he surrendered to an officer present and spontaneously admitted that he killed Mr. Coats. Subsequently, appellant executed a detailed written confession of the attempted robbery and murder.
During the trial, counsel for appellant, in an effort to keep the State from introducing evidence of the crime, argued, "Mr. Pinkton has already admitted as to the deliberate design, as well as what he was doing when this happened." and "He has admitted the intent." During the sentencing hearing, appellant testified from the witness stand that he shot and killed Coats and that he had been planning to rob and murder Coats for two days.
Reddix v. Thigpen, 728 F.2d 705 (5th Cir.1984), cert. den., ___ U.S. ___, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984), Reddix v. State, 381 So.2d 999 (Miss. 1980); and Jordan v. Watkins, 681 F.2d 1067 (5th Cir.1982), Jordan v. State, 365 So.2d 1198 (Miss. 1978), were decided before the 1983 amendment to § 99-79-101 was passed, and they give us an insight into what the legislature intended. In Reddix, the Court (Fifth Circuit) stated:
Similarly, in Jordan v. Watkins, 681 F.2d 1067 (5th Cir.1982), a case involving only one perpetrator, the jury instructions made clear that felonious intent was a prerequisite to imposition of the death penalty. Because the crime had only one perpetrator, the intent found could not be anyone's but the defendant's. In Reddix's case, however, involving three perpetrators, nothing that transpired at trial and nothing in the instructions given at his sentencing hearing clarifies the confusion left by the jury instructions given at the guilt phase of the trial.
728 F.2d at 710.
The obvious purpose and intent of the legislature in enacting § 99-19-101(7) was to provide that, in those cases where there were two or more persons involved in a felony murder crime, on conflicting facts, *312 the jury make a written finding on at least one of the four requisites enumerated in Enmund, viz, (a) the defendant actually killed, (b) the defendant attempted to kill, (c) the defendant intended that a killing take place, or (d) the defendant contemplated that lethal force would be employed. No such situation exists in the case sub judice that would require such a finding, since the evidence was uncontradicted on each of the four. As stated, the appellant Pinkton testified at the sentencing hearing that (a) the defendant actually killed Coats.
Many times through the years, this Court has, without hesitation, stated what the legislature intended in passing a statute, particularly where a literal reading of the statute, when applied to a question before the Court, would make both the legislature and the Court look foolish, if the literal wording were not given the meaning intended by the legislature. In my opinion, declining to give meaning here to the obvious intention of the legislature will result in a miscarriage of justice.
Further, since the majority, as they have done, steadfastly followed the literal wording of the amendment, then they should note that § 99-19-101(7) does not state that the jury must make a separate written finding of one of the four provisions. Consequently, the majority should observe that the jury made written findings of four aggravating circumstances which existed beyond reasonable doubt in the case sub judice, viz:
1. The capital murder was committed while the Defendant was engaged in the commission of an attempt to commit the crime of Armed Robbery.
2. The capital offense was committed by a person under sentence of imprisonment.
3. The capital offense was committed for pecuniary gain.
4. The capital offense was committed for the purpose [sic] avoiding or preventing a lawful arrest.
In those aggravating circumstances, the jury made a written finding that Pinkton committed the crime of murder while engaged in the commission of an attempt to commit the crime of armed robbery. The other three findings related directly to Pinkton, since he was the only person involved in the crime.
The majority opinion proclaims in no uncertain terms that it is reversing this capital murder case, not upon any federal court decision or constitutional violation, federal or state, but upon Mississippi law, viz, amendment to § 99-19-101. The federal courts have provided the states, particularly Mississippi in the present case, with an escape from Enmund through its recent decisions, e.g., Reddix v. State, and Jordan v. State, supra. Today this Court, by its interpretation of § 99-19-101(7) and the construction placed upon it, again places the yoke back on the necks of law enforcement and trial courts and blames Mississippi law rather than federal law.[1] In my view, the majority is out-federalizing the federal courts, and I dissent from the majority opinion.
WALKER, P.J., joins this dissent.
NOTES
[1] Pinkton testified that he could no longer live with his relatives for fear of causing them to lose their foodstamp benefits.
[2] Pinkton was convicted of grand larceny in the Circuit Court of Bolivar County in December 1982. He was sentenced to five years' imprisonment; this sentence was suspended, and Pinkton was placed on probation for three years. The probation was revoked when he was bound over to the grand jury in the present case.
[1] In Stringer v. State, Miss. No. 54,805, decided February 27, 1985, the majority reversed the murder conviction of Stringer on the basis of Mississippi law, and declined to follow United States v. Leon, ___ U.S. ___, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which required an affirmance of the case. See this writer's dissent in Stringer.