# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-DP-00058-SCT

*JUSTIN BARRETT BLAKENEY a/k/a JUSTIN BLAKENEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/15/2014 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| TRIAL COURT ATTORNEYS: | WILLIAM R. LaBARRE |
| | ANTHONY J. BUCKLEY |
| | J. RONALD PARRISH |
| | JEANNENE PACIFIC |
| | MICHAEL DUANE MITCHELL |
| | JOHN ANTHONY PIAZZA |
| | DENNIS LEE BISNETTE |
| | RAY CHARLES CARTER |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | WILLIAM R. LaBARRE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRAD ALAN SMITH |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED - 11/09/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Justin Barrett Blakeney was convicted of capital murder and sentenced to death after a trial in Jones County before Greene County jurors. Because reversible error occurred in the denial of Blakeney's opportunity to present a complete defense, by allowing evidence and testimony obtained from informants working as State agents, and through prosecutorial misconduct, we now reverse Blakeney's conviction and sentence and remand his case for a new trial on the merits.

### FACTS AND PROCEDURAL HISTORY

¶2.     On August 10, 2010, twenty-six-year-old Justin Barrett Blakeney called 911, stating that two-year-old Victoria Viner ("V.V.") had become unresponsive. Blakeney and Lidia Viner, V.V.'s mother, had been dating for approximately eight months at that time.[1] Viner was a noncitizen of the United States.

¶3.     Blakeney and Viner had been living together for approximately six months. V.V. had attended daycare when Blakeney first moved in, but Blakeney had been keeping V.V. at home for around two months because he did not have a job and the couple needed to save money. Blakeney would watch V.V. from when Viner left for work around 10 a.m. until around 2 p.m. when Viner returned home.

¶4.     On August 10, Viner had left for work around 10 a.m., and Blakeney had been alone with V.V. She was still asleep in her crib at the time Viner left. Around 10:30, Blakeney saw that V.V. was awake. Blakeney asked if she wanted to get some milk, and she responded yes. Blakeney stated that he noticed that V.V. had squinted her eyes and thought that she had a

---

[1]Viner is referred to as "Lilly," "Lily," and "Lydia" throughout the record.

headache. Blakeney picked her up from her crib and placed V.V. on the floor. He began walking into the kitchen with V.V. following behind. Blakeney stated that he had taken two steps into the kitchen when he heard what sounded like a loud thump. Blakeney turned around and saw V.V. lying face down on the carpet. When Blakeney picked her up, V.V. was unresponsive and limp. V.V. then began to tense and clench both her fists to her chest. Blakeney called 911 and then called Viner at work.[2] Viner also called 911 and, when asked if V.V. had been having medical problems lately, stated that V.V. had been throwing up and had been cranky. Viner stated that she had been giving V.V. Tylenol because she had not felt well.

¶5.     Chief William Lee Garrick, a medical first responder for the Calhoun fire department, arrived at Blakeney's house approximately four or five minutes after Blakeney had called 911. Chief Garrick testified that when he arrived, Blakeney had been sitting in a chair next to the couch where V.V. had been lying and had waved Chief Garrick in. Blakeney had informed Chief Garrick that he did not know what had happened, that he had been in a different room and had found V.V. that way.

¶6.     V.V. was rushed to the South Central Regional Medical Center emergency room. Michael LaRochelle, M.D., medical director of the emergency department at South Central, saw V.V. when she arrived at the hospital and began an examination. Dr. LaRochelle stated that he had not found any obvious reason why V.V. had been in an unresponsive condition but a CAT scan had shown some diffuse injury throughout her brain. A diffuse injury of the

---

[2]There was confusion in the record as to whether Blakeney called 911 or Viner first.

brain is a generalized brain injury as opposed to a specific localized injury. Dr. LaRochelle explained that if a person were to fall and hit her head, normally the person would bleed at the point where she had hit her head. A diffuse injury causes swelling and microscopic bleeding throughout the entire brain. Dr. LaRochelle stated that the diffuse injury had indicated to him "a repeated episode or at least one severe shaken type scenario or certainly a repeated type of injury that caused swelling and diffuse injury." Because of suspected child abuse, personnel in Dr. LaRochelle's department called in law enforcement to investigate the matter. V.V. had no other abnormal bruising or marks on her body.

¶7.     Dr. LaRochelle made the decision to transfer V.V. to the University of Mississippi Medical Center in Jackson. While at UMMC, V.V.'s attending physician asked Dr. Scott Benton to assist in her treatment as a consulting physician. Dr. Benton informed investigators that he believed the case to be one of child abuse. V.V. had extensive brain swelling and was showing signs of brain death. CT scans showed that V.V.'s brain had begun pushing through her skull. V.V. never regained consciousness. She was disconnected from life support and formally pronounced dead on August 12, 2010.

¶8.     During an interview with the police, Blakeney stated that V.V. had an incident with a stool two weeks before she passed away.[3] Blakeney stated that V.V. had been sitting outside on a stool while Blakeney had been smoking. When V.V. attempted to get down, she fell off of the stool and hit her head. Viner had not been present at that time. Blakeney initially denied that V.V. had incurred any bruises resulting from the fall. Blakeney later

---

[3]Blakeney's interviews with the police were admitted into evidence, along with the 911 calls.

4

admitted that V.V. actually had obtained two black eyes, "raccoon eyes," after her fall from the stool. He stated that after the stool incident, V.V. had been complaining of headaches and had been throwing up in the two weeks prior to her death. Blakeney and Viner had not taken V.V. to the doctor because they thought that it was getting better. Blakeney repeatedly denied harming V.V.

¶9. Dr. Amy Gruszecki, a forensic pathologist, performed an autopsy on V.V. Dr. Gruszecki determined that V.V.'s cause of death was blunt force trauma to the head and classified her manner of death as homicide.

¶10. On December 16, 2010, a grand jury for the Jones County Second Judicial District indicted Blakeney for the crime of capital murder while in commission of the crime of felonious child abuse, pursuant to Mississippi Code Sections 97-3-19(2)(f) and 97-3-73.[4] Viner also was charged. Viner pleaded guilty to a negligence charge, was placed on probation, and later was deported to Mexico.

¶11. The trial court appointed Blakeney counsel through the Capital Defense Division of the State Public Defender's Office. Blakeney's trial was continued several times, and Blakeney remained in jail. On April 1, 2013, Jones County Sheriff's Department officers conducted a shakedown, which included a search of Blakeney's cell and person. In the course of the search, deputies found in Blakeney's possession the 88 Precepts of the Aryan

---

[4]A motion to sever stated that Blakeney had been indicted with co-defendants Jamed Goodman, Kewan Hosey, and Nicholas Lydie; however, it had been filed in error.

Brotherhood.[5] Also found on Blakeney's body were various tattoos that Blakeney had obtained after his incarceration, including a large swastika on his chest area and two lightning bolts on his side. These tattoos were symbols of membership in the Aryan Brotherhood.

¶12.    After the search, a confidential informant, later identified as Gregory "Hobo" Hancock, contacted the sheriff's department and relayed conversations that he allegedly had with Blakeney concerning V.V.'s murder and Blakeney's efforts to gain membership into the Aryan Brotherhood. On April 5, 2013, Hancock was transported to the sheriff's office. Hancock alleged that Blakeney had confessed that he had killed V.V. "by placing a telephone book on her head and hitting it as hard as he could with his fist." Hancock also stated that Blakeney had confessed to striking the child at other times when Viner was not looking or had not been present, including an occasion when he had kicked a stool out from under the child, resulting in her having two black eyes. Hancock was himself a member of the Aryan Brotherhood and stated that Blakeney had relayed this information to see if he could use V.V.'s murder to gain membership.

¶13.    Hancock wanted to make a deal. The District Attorney's (DA) Office stated that Hancock's word was not good enough. Hancock then offered to wear a camera and microphone back to the jail cell to talk to Blakeney. The DA's office, along with Sgt. Tonya

---

[5]The Aryan Brotherhood is described as a racial supremacy organization advocating the supremacy of the white race to the disparagement of all others. It is also referred to as the Aryan Nation throughout the record.

Madison and Maj. Don Scott, instead agreed that Hancock would go to visitation the next day to talk to Blakeney.

¶14. On April 6, 2013, the sheriff's department recorded a phone call while Hancock had been visiting Blakeney at the same time as Blakeney's mother.[6] The conversation went as follows:

> Hancock: What's up buddy?
> Blakeney: What you doing son?
> Hancock: Nothing.
> Blakeney: You come over here to visit us huh?
> Hancock: Yeah.
> Hancock: You alright?
> Blakeney: Yeah.
> Hancock: That's good.
> Hancock: I told yall I was gonna come up here.
> Blakeney: Hey, ah, I'm glad you came, Seth told me that Big Dave sent the word up the road to get me smashed when I got up there, what is that all about?
> Hancock: About a bunch of lies, you know like I gave you my word right?
> Blakeney: Yeah.
> Hancock: I talked to Bedrock.
> Blakeney: Aight.
> Hancock: It's understood to me that the only way of a child, death of a child, it's got to be bi-racial.
> Blakeney: Right.
> Hancock: And it's got to be under the 88 precepts, that's what he told me. I spoke with him this morning, him and Josh Maxey and they said the only way to get accepted or passed out for vote is that if it was done bi-racial child.
> Blakeney: Aight.
> Hancock: You know what I am saying.
> Blakeney: Yeah.
> Hancock: So.
> Blakeney: You see I ain't, if I do go I ain't, it ain't gonna be on capital murder gone be on
> Hancock: It don't matter what it is, it don't matter what charge it is.
> Blakeney: It's gonna be negligent manslaughter if it's anything.

---

[6]All visitation phone calls were recorded.

Hancock: Just the bi-racial killing is gonna get you in there; you understand what I am saying.
Blakeney: Aight.
Hancock: You know the 88 precepts you gonna go by that.
Blakeney: Aight.
Hancock: That cool with you.
Blakeney: Yeah I mean.
Hancock: Aight don't, I am sticking my neck out on the line that's why I came up here to talk to you. I promised you I would.
Blakeney: Ok.
Hancock: Don't let me down man.
Blakeney: I ain't gonna let you down.
Hancock: Aight brother.
Blakeney: Aight brother.
Hancock: Aight.

¶15. After listening to the recorded phone call, Sgt. Madison with the Jones County Sheriff's Department executed a search warrant for Blakeney's cell and person in an effort to find evidence related to V.V.'s death. Sgt. Madison wrote in her affidavit that the murder investigation had revealed that V.V. had two black eyes at one time but that Blakeney had claimed that the child had fallen from a stool. Sgt. Madison stated that the incident of V.V. having two black eyes previously had not been released to the public and that the only way Hancock could have known of the incident was from Blakeney. Her affidavit read, "The mother of the child was Mexican making the child in Aryan Nation classification a 'half-breed.' Blakeney's tattoos, Aryan literature and statement constitute evidence of his motive for the murder of two year old [V.V.]"

¶16. On July 2, 2013, the trial court issued a search warrant for Blakeney and his cell based on Sergeant Madison's affidavit. The search warrant was executed the same day. As a result, the following things were found:

    1. Swastika tattoo on left side of chest;
    2. Two lightning bolts on right side of stomach area;
    3. Five-point star on back area of left arm;
    4. Large cross with design on back area;
    5. Five-point star on back area of right arm;
    6. Skull tattoo with swastika symbol on right leg;
    7. Two face tattoos on right leg;
    8. Two more face tattoos on right leg; and
    9. Four blocks with dates 10, 11, 12, 13 on right leg.

¶17. The prosecution disclosed Hancock as a witness in July 2013. Trial was reset for November 18, 2013. Another continuance moved the trial to February 3, 2014.

¶18. Because of the pretrial publicity generated by the case, Blakeney filed a motion for a change of venue. The local media first had reported solely on the fact that Blakeney had been arrested and charged in a child's death. However, as the case progressed and after the search warrant and affidavit had been disclosed to the media, newspaper articles began to have headlines such as: "Alleged baby killer affiliated with hate group"; "Accused murderer in Aryan Nation, called toddler victim a 'half-breed'"; "Blakeney cleared to face death penalty"; "Accused toddler-killer wants trial out of Jones"; "Alleged Jones County child killer hoped to gain Aryan Nation membership"; "Racial motivation in child death?"; etc.[7] An article in *The Laurel Leader-Call* listed the top ten stories of 2013, in which number five was the death-penalty case of Blakeney.[8]

---

[7]The media outlets included: *The Chronicle* - Comprehensive local news for Laurel, Ellisville, and Jones County; *The Laurel Leader-Call*; WDAM; WCSH; *The Republic*; The Associated Press; *The Hattiesburg American*.

[8]The article stated: "The death penalty case of Justin Blakeney is delayed for a fifth time after allegations that he called 3-year-old part-Hispanic victim Victoria Viner a 'half-breed' and got swastika tattoos while he was in jail in an effort to gain favor with the Aryan Nation."

¶19. The trial court denied Blakeney's motion for change of venue. The trial court's order stated:

> The Court further finds that at a hearing on November 18, 2013, [Blakeney's] counsel mentioned the possibility of filing a Motion for Change of Venue. The Court instructed counsel to file said Motion within ten (10) days of said hearing. Instead, counsel for [Blakeney] waited until January 31, 2014, three (3) days prior to the beginning of the trial of this matter to file said Motion. The Special Venire in this matter had been pulled at least a week prior to [Blakeney's] filing said Motion for Change of Venue.
> Further, the Court finds that any issues that may present themselves with regard to the necessity of a change of venue will be dealt with during voir dire. Therefore, the Court finds that the Motion for Change of Venue was not timely filed and is not well-taken.

¶20. Voir dire ensued, and a jury consisting of twelve jurors was selected from a Jones County venire on February 4, 2014. Each juror had been given a special juror information questionnaire to complete, on which he or she was required to answer questions about his or her feelings on crime, the death penalty, and on preferred media outlets, *inter alia*.

¶21. Largely due to pretrial publicity-based opinions, after the twelve regular jury members had been sworn in, no potential venire members remained to serve as alternate jurors. Before any testimony, one of the selected jurors sought to be excused for a family emergency. With only eleven jurors to serve, the trial court called a mistrial. It additionally noted that the local publicity made it impossible for Blakeney to obtain fair and impartial jurors from Jones County. Therefore, the court *ore tenus* reversed its previous denial of the change of venue sought by Blakeney.

¶22. On March 25, 2014, the trial court transferred venue to Greene County and set the trial date for July 7, 2014. All outstanding motions were to be heard on June 10, 2014.

¶23. Blakeney had been attempting to obtain information with which he could impeach Hancock. Through supplemental discovery, Blakeney attempted to gain access to information not attainable through public record. Blakeney then sought to compel its production. The trial court stated that it would not compel information that was not in the personal possession of the prosecutor – including information in possession of the sheriff's department. Blakeney eventually gained access to the information through a subpoena duces tecum. On June 2, 2014, the prosecution filed a Motion to Admit Statement of Greg Hancock to Jones County Deputy Sheriff Tonya Madison and Deputy Sheriff Don Scott. Hancock did not testify at trial.

¶24. On June 26, 2014, the State produced a letter disclosing a new jailhouse informant, along with three previously undisclosed expert witnesses. The trial court denied Blakeney's motion for continuance, and his trial commenced in the Circuit Court of Jones County before a Greene County jury on July 7. The jury returned a verdict finding Blakeney guilty of capital murder on July 11. In a separate sentencing hearing, the jury found that Blakeney should suffer death.

## ISSUES

¶25. Although Blakeney raises twelve issues on appeal, we find the following three issues resulted in reversible error and denied Blakeney his fundamental right to a fair trial:

I.     Whether the trial court erred in denying Blakeney a continuance after the State introduced previously undisclosed expert and lay witnesses shortly before trial.

II.    Whether the trial court erred in admitting any evidence obtained from or through Hancock or Smith.

11

III.    Whether prosecutorial misconduct tainted the litigation.

We decline to address the remaining issues.

**ANALYSIS**

¶26.    Because this is a capital murder case, this Court must have an "enhanced awareness" of its "awesome responsibility." ***Pinkton v. State***, 481 So. 2d 306, 308 (Miss. 1985). "Because of the terrible character of this penalty, we have long taken a different approach in reviewing capital cases. In such matters, we employ a higher level of scrutiny." ***Id.*** (quoting ***Jones v. State***, 461 So. 2d 686, 690 (Miss. 1984)). The penalty of death is totally irrevocable. ***Id.*** (quoting ***Furman v. Georgia***, 408 U.S. 238, 306, 92 S. Ct. 2726, 2760, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring.)).

> **I.    Whether the trial court erred in denying Blakeney a continuance after the State introduced previously undisclosed expert and lay witnesses on the eve of trial.**

¶27.    Blakeney first argues that the State engaged in trial by ambush in its disclosure of new material shortly before trial.

¶28.    On June 26, 2014, the State produced a letter disclosing for the first time that the State would be offering testimony from a new jailhouse informant, Randall "Satan" Smith. Like Hancock, Smith was an Aryan Brotherhood member.[9] The disclosure stated that Smith would testify that, the previous October, Blakeney had confessed to killing V.V. and that the confession had been repeated in June 2014 after the district attorney had placed Smith together with Blakeney in the medical unit at the Jones County Jail.

---

[9]Smith testified that the Aryan Brotherhood had three different ranks: 6s, 9s, and 13s. Smith was ranked as a 13, the highest ranking in the gang.

12

¶29.    Also attached was a letter written by Smith and dated June 19, 2014, that stated:

> Tuck,
> This bruder comes to you under my 13 and is to be treated with all respect and benifits of a bruder, he is to be put in under the "13" under [ ].[10]
> Name: Justin Blakeney
> Age: 30
> Time served as of present date: 3 years 7 months
> Charges: Capital Murder
> Education" 11th graed
> This bruder was recruited outside of jail and did the "work" to become one of us. He has spilled the blood of a mixed race in the honor of our brotherhood. Given this and his beliefs I bring him forward as a full pledged Bruder and has earned his right to be known from this day forward as our bruder. May God keep us pure and of honor.

The letter purportedly was signed by Smith and Blakeney at the bottom. Smith had worn a wire into Blakeney's cell in which Blakeney could be heard during a conversation asking if he sent the letter.[11] Smith had also written in Blakeney's Bible: "Mein bruder, this bruder is a true bruder and is to be accepted without question. He has put in the necessary work to be patched. I stand for my bruder above all 13. He is to be given utmost respect and honor within our family. Smith signed it, "sinn fein bruder, Randall Smith."

¶30.    In addition, the State identified three previously undisclosed expert witnesses: Rigo Vargas of the Mississippi State Crime Lab; Randy Johnson of the Jones County Sheriff's Office; and Tom Thomas, a forensic computer expert. Vargas was to testify that the signature on the document was in fact Blakeney's. Included were commissary receipts that Blakeney had signed over the past years to Vargas. Johnson was to testify that the search warrant on

_____

[10]Smith testified that "bruder" was German for brother.

[11]This recorded conversation was not admitted at trial.

13

Blakeney's cell had been executed on June 22 or 23, and that Blakeney had written two letters to Johnson – one expressed his determination to join the Aryan Brotherhood no matter what. Thomas was in the process of examining a hard drive to determine if he could recover video recordings from the cell made when Smith and Blakeney had been together. And lastly, it stated that Scott Black, C&M Music, was engaging in efforts to clear out background noise in the recording between Blakeney and Smith.

¶31. On July 1, 2014, Blakeney filed a motion for a continuance, requesting that the trial court postpone the trial date and issue a scheduling order allowing the defense time to prepare for trial. Blakeney argued that testing was ongoing and incomplete and that, once completed, the defense would need additional time to fully investigate and prepare a defense to the newly developed information. Blakeney also needed time to acquire his own expert witnesses. Counsel for Blakeney expressed his duty to perform a full and complete investigation to be able to determine a litigation strategy, to prepare additional pretrial motions and to prepare for trial. He argued the July 7 trial date did not allow adequate time to complete those things in accordance with the Constitution. Blakeney argued that his Eighth Amendment right not to be subjected to cruel and unusual punishment would be significantly impaired if he was not able to complete a sufficient investigation.

¶32. On the same day, the trial court heard Blakeney's motion. The court stated:

> [T]he rule requires you to supplement discovery as you receive it. And as far as the Court sees it at this time [the State] [has] done that. . . .
> But I understand too that Mr. LaBarre, he's very zealous about defending his client. So just so long as the State supplements the discovery it has and the Court does not have to make a ruling that it's not timely, then we're all right.

14

Of course, at this time based on what's been presented, the Court would deny any continuance in this case.

¶33. Counsel for Blakeney repeatedly reasserted his objections to the trial proceeding, all of which the trial court denied. Smith and Vargas each testified at trial. Additionally, Smith's letter was admitted into evidence. Smith testified that he had been a member of the Aryan Brotherhood since he was eighteen years old. In 2013, Smith had a grand larceny charge for which he was arrested and housed in the Jones County Jail. Smith had not been Blakeney's cellmate, but he had been in the cell directly across from Blakeney. Smith testified that Blakeney had asked if he was affiliated with the Aryan Brotherhood and then brought up that he was a prospective member. In order to become a member of the gang, Smith stated that "you have to put in what we call work, which is an act of violence or murder." A "patched member" then has to present you – like write a letter of recommendation.[12] Smith's testimony went as follows:

> PARRISH: What did [Blakeney] tell you? I want you to use the specific words he told you.
> SMITH: He told me that he had killed somebody, somebody of a mixed race.
> PARRISH: Well I want you to tell me exactly [t]he words he used?
> SMITH: That he had put in his work.
> PARRISH: Okay.
> SMITH: That he had killed the little bastard.

Smith testified that he had not known at the time how old the person Blakeney was referring to was. When he found out that V.V. had been two years old, he informed Blakeney that the gang did not participate in the harm of women or children and that he could never be a patched brother. Smith then bonded out of jail and did not relay his conversation to anybody.

---

[12]A patch is a tattoo.

¶34. Smith testified that when he returned to jail in March, with three felony charges pending, he wrote a letter to the sheriff's office stating that he wanted to talk about Blakeney's case. Smith had learned that he had severe terminal chronic obstructive pulmonary disease and wanted to get out of prison before he died. Smith approached the State to make a deal. After the meeting, Parrish agreed to decline prosecution of Smith's felony charges in exchange for Smith's truthful testimony. However, the district attorney's office told Smith that his word was not good enough, in view of his background.

¶35. The district attorney's office then deliberately put Smith in a medical cell with Blakeney in an attempt to gain more information. Smith informed Blakeney, untruthfully, that the Aryan Brotherhood had changed its recruiting style and that Blakeney could now get a patch. Smith offered to write a letter of recommendation for Blakeney and testified that he had Blakeney sign it.[13]

¶36. Vargas, a forensic scientist, testified that the handwriting on the Smith letter matched the handwriting on the commissary samples. Vargas's report was not issued to the defense until trial began.

¶37. A trial court's discovery ruling is reviewed for an abuse of discretion resulting in manifest injustice. *Fulks v. State*, 18 So. 3d 803, 805 (Miss. 2009) (citing *Payton v. State*, 897 So. 2d 921, 942 (Miss. 2003)). The procedure to follow when faced with a discovery violation is as follows:

---

[13]Sgt. Madison testified that Smith's letter had been dated June 6, 2014, but that she could not state the exact date that it got to the sheriff's department. The prosecution did not disclose anything to Blakeney until June 26.

In ***Duplantis v. State***, 644 So. 2d 1235 (Miss.1994), this Court stated:

> ***Box v. State***, 437 So. 2d 19 (Miss.1983) (Robertson, J., specially concurring), first set forth the procedure trial courts should follow when confronted with a discovery violation. Miss. Unif. Crim. R. Cir. Ct. Prac. 4.06 [now Uniform Circuit and County Court Rule 9.04] now reflects the ***Box*** procedure. This procedure is equally applicable in capital cases.
>
> When faced with previously undisclosed evidence to which the defendant has objected, the trial court should give the defendant a reasonable opportunity to familiarize himself with the evidence. If the defendant thereafter believes he may be prejudiced by admission of the evidence because of his lack of opportunity to prepare to meet it, he must request a continuance. Should the defendant fail to request a continuance, he has waived the issue. If he indeed requests a continuance, the state may opt to proceed without the undisclosed evidence, else the trial court must grant the continuance. Failure to follow the ***Box*** guidelines is prejudicial error, requiring reversal and remand.

***McCullough v. State***, 750 So. 2d 1212, 1217 (Miss. 1999) (quoting ***Snelson v. State***, 704 So. 2d 452, 458 (Miss.1997) (citations omitted)).

¶38.     The accused has an interest in "knowing reasonably well in advance of trial what the prosecution will try to prove and how it will attempt to make its proof which, of course, includes the names of persons the State expects to call as witnesses." ***Box v. State***, 437 So. 2d 19, 21 (Miss. 1983). The prosecution has a conflicting interest in presenting all relevant and probative evidence to the jury. ***Id.*** The way in which the State is committed to handling these conflicting interests is to make sure that "well in advance of trial, each side has reasonable access to the evidence of the other." ***Id.***

¶39.     At that time, Rule 9.04(A) of the Uniform Rules of Circuit and County Court Practice required prosecutors to disclose evidence "which is known or by the exercise of due diligence may become known to the prosecution." *See **Fulks***, 18 So. 3d at 804. The State

17

argues that no ***Box*** violation occurred because there is no assertion that the State withheld discovery materials. However, this Court previously has held that the prosecution's failure to "unearth certain evidence until the last minute hardly eviscerates the prejudice to a defendant caught unaware, nor the necessity for reversal where the circuit court denies the defense request for a reasonable continuance." ***West v. State***, 553 So. 2d 8, 17 (Miss. 1989).

¶40. "Society wins not only when the guilty are convicted but when criminal trials are fair[.]" ***Brady v. Maryland***, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963). In ***McCullough v. State***, this Court held that a discovery violation had occurred when the State disclosed impeachment testimony on the day of trial. ***McCullough***, 750 So. 2d at 1217. Even though the State had not discovered the evidence until that morning, this Court still held that the trial court reversibly erred in denying the defendant's requested continuance. ***Id.*** This Court came to the same conclusion in ***Fleming***, when the prosecution disclosed new expert testimony five days before trial. ***Fleming v. State***, 179 So. 3d 1115, 1118-19 (Miss. 2015).

¶41. Here, Blakeney argued that he needed more time to gather information to impeach Smith's testimony. At the hearing, counsel for Blakeney stated that, in order to provide effective representation to his client, he needed additional time to find out information about Smith and to prepare an effective defense. Blakeney's counsel stated that he did not know where Smith was or a phone number to reach him.[14] The introduction of this evidence at so late a date, although it might not have violated the timeliness requirement of the rule, left

---

[14]The prosecution stated that Smith had been in the Jones County Jail but recently had been moved for his protection to the Pearl River County Jail.

18

Blakeney with a situation in which he had no time to prepare an adequate defense in rebuttal. This Court in **Fulks** stated that the **Box** Court's condemnation was "a trial by ambush in which critically important evidence was sprung on a defendant with such abruptness that defense counsel had time neither to investigate its veracity nor to make meaningful preparation to meet it." **Fulks**, 18 So. 3d at 805.

¶42. The prosecution argues that Blakeney did not attempt to obtain a handwriting expert to rebut Vargas's testimony. We find no merit in the contention. The defense did not know of Vargas's testimony until a week before trial began, which included a holiday weekend in between. Vargas's report also was not provided to the defense until trial already had begun. The defense was able to speak to Vargas only in the few minutes before he took the stand.

¶43. With the untimely introduction of Smith's testimony, the State's case added extremely inflammatory testimony for which the defense needed time to prepare.[15] Had the defense had time to obtain impeachment evidence, it likely would have undermined Smith's testimony in favor of the defense. The addition of those new witnesses so close to trial warranted a continuance. Therefore, the trial court reversibly erred in its failure to allow the defense adequate time to prepare for trial.

¶44. In addition, conflicting testimony indicated that the sheriff's department might have been in possession of Smith's letter as early as June 6. Different agencies under the same government are considered the "prosecution team." **Manning v. State**, 158 So. 3d 302, 306 (Miss. 2015) (citing **U.S. v. Antone**, 603 F. 2d 566, 569 (5th Cir. 1979)). The prosecution

---

[15]We note that the State's contention that a defendant would continue making incriminating statements to avoid going to trial is illogical.

argued that it had learned of Smith on Wednesday, June 18, 2014, or on Tuesday, June 17th, and that Smith supposedly had information against Blakeney. The prosecutor stated he first talked to Smith on June 18 and was given Smith's letter. Yet, Smith's identity and possible testimony was not provided to the defense until June 26. "It is the duty of the State to provide each defendant with a fair trial, not to engage in tactics which mirror 'prosecution overkill.'" *Flowers v. State*, 842 So. 2d 531, 564 (Miss. 2003) (*Flowers II*). Indeed, the "fair way is the safe way, and the safe way is the best way in every criminal prosecution." *Id.* (citations omitted).

¶45.    Because the prosecution's late disclosure of previously undisclosed witnesses left the defense without adequate time to prepare, we find that a continuance should have been granted.

>        II.    **Whether the trial court erred in admitting evidence obtained from or through Hancock or Smith.**

¶46.    Blakeney next argues that both Smith and Hancock were working as agents of the State and that their testimony was, therefore, inadmissible.

¶47.    At the time of Hancock's and Smith's encounters with Blakeney, Blakeney's right to assistance of counsel previously had attached. "Mississippi Constitution Art. 3, Section 26 provides that "[i]n all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, . . . and he shall not be compelled to give evidence against himself; . . . ." *Cannaday v. State*, 455 So. 2d 713, 722 (Miss. 1984). Once this right attaches, interrogation may not commence unless the defendant expressly waives his right to counsel. *Id.* (citing *Massiah v. United States*, 377 U.S. 201, S. Ct. 1199, L. Ed. 2d 246

20

(1964)). Self-incriminating words secured in violation of a defendant's right to assistance of counsel may not be used as evidence at his trial. *Page v. State*, 495 So. 2d 436, 441 (Miss. 1986).

¶48.     "A defendant is denied his Sixth Amendment rights when the trial court admits in evidence incriminating statements that state agents 'had deliberately elicited from him after he had been indicted and in the absence of counsel.'" *Kuhlmann v. Wilson*, 477 U.S. 436, 441, 106 S. Ct. 2616, 2620, 91 L. Ed. 2d 364 (1986) (citations omitted). In *Kuhlmann*, the Supreme Court noted that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Id.* at 459. "The United States Supreme Court, in *Massiah* . . . , and *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), provided guidance on the use of government agents. Where a co-defendant specifically agrees to work as an agent of the government, statements made to the co-defendant by the defendant were inadmissible." *Brown v. State*, 682 So. 2d 340, 351 (Miss. 1996).

A.      **Smith as Agent of State**

¶49.     The United States Supreme Court has explained why a defendant's right to counsel is so important, stating: "Embodying 'a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself,' *Johnson v. Zerbst*, 304 U.S. 458, 462–463, 58 S.Ct. 1019, 1022, 82 L. Ed. 1461 (1938), the right to counsel safeguards the other rights deemed essential for the fair prosecution of a criminal

proceeding." ***Maine v. Moulton***, 474 U.S. 159, 169, 106 S. Ct. 477, 483, 88 L. Ed. 2d 481 (1985).

¶50. Blakeney was not aware at the time he allegedly signed the letter that Smith was attempting to elicit information to give to the State. It also is undisputed that Smith gained an advantage in his mission to do this. First, a defendant must show that the informant was not freelancing at the time he obtained incriminating evidence, but that he was working for the State. ***Brown***, 682 So. 2d at 351. The record reflects that Smith first confronted law enforcement about testifying against Blakeney. The State argues that it promised Smith would be released from custody if he testified truthfully for the State, not for obtaining statements against Blakeney. At that point, because Smith approached the State without prompting, he could not have been considered an agent of the State. However, the State informed Smith that his word was not good enough. Therefore, the State put Smith in the medical cell with Blakeney specifically in an attempt to elicit information.

¶51. Second, "a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." ***Kuhlmann v. Wilson***, 477 U.S. 436, 459, 106 S. Ct. 2616, 2630, 91 L. Ed. 2d 364 (1986).

¶52. In an attempt to get Blakeney unknowingly to offer incriminating evidence against himself, Smith specifically elicited further testimony from Blakeney by stating falsely that

the Aryan Brotherhood had relaxed its standards and that Blakeney could now become a member. On cross-examination, Smith stated:

> SMITH: Yes, sir. I told him that I'd produce him evidence if he could help me out.
> LABARRE: Okay. So all you had at that point was your word?
> SMITH: At that time, yes sir.
> LABARRE: And he said, if you give me something else, I can cut you loose?
> SMITH: In a manner of speaking, yes.
> LABARRE: In a manner of speaking. And you knew what that meant?
> SMITH: Yes, sir.

The State equipped Smith with a wire to record the conversation. Therefore, at the behest of the State, Smith solicited statements from Blakeney after a point at which his Sixth Amendment right to counsel had attached. This was improper. Smith was working as an agent of the State and his testimony was admitted in violation of Blakeney's Fifth and Sixth Amendment rights to counsel.

### B. Hancock as Agent of State

¶53. Similarly, Hancock also first approached the State, alleging that Blakeney had made statements relating to his case. The State informed Hancock that his word was not good enough. Maj. Scott testified that he, Madison, and the DA's office had made the decision to allow Hancock to go to visitation to see if he could get Blakeney on tape. Major Scott testified that "the plan" was to "enter into a conversation with [Blakeney]." He specifically stated that the assistant district attorney had approved the plan. At that time, Hancock had been in jail for failure to pay old fines. However, Maj. Scott contacted the justice court judge who serves the Ellisville Police Department court and asked if Hancock could be put back on partial pay rather than hold him for the old fines. He testified that he called the judge so

23

Hancock could get out of jail. And although Blakeney called Hancock to the phone at visitation, Hancock initiated the conversation about the Aryan Brotherhood in an attempt to provoke Blakeney to make incriminating statements.

¶54. "[T]he prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 171. The Supreme Court explained:

> [T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.

*Id.* at 176 (citation omitted). Because the State again, through Hancock, knowingly exploited an opportunity to confront Blakeney without his counsel being present, his testimony also should have been excluded. The State created an opportunity for Hancock to get out of jail and to go to visitation in an attempt to get incriminating statements from Blakeney. The State came up with a plan, approved by the district attorney's office, to subvert Blakeney's counsel.

¶55. Accordingly, both Smith's testimony and documents and Hancock's recorded conversation with Blakeney were admitted improperly. Because those errors violated Blakeney's Sixth Amendment right to counsel, his conviction and sentence must be set aside and this case remanded for a new trial.

### III. Prosecutorial Misconduct

24

¶56. In addition, Blakeney contends that the prosecutor engaged in a pattern of "sandbagging" defense counsel and concealing both inculpatory and exculpatory information about Hancock and Smith to gain an unfair tactical advantage. This Court previously has stated:

> Despite our reluctance to reverse, we are duty bound and sworn by oath to uphold the laws of the State of Mississippi. We are thus entrusted with the responsibility of ensuring that the criminal justice system of this state works to guarantee that every defendant brought before its tribunals receives a fair and impartial trial. To that end, we must instill in all officers of the trial courts a sense of their own responsibility in preserving our system of justice. To avoid abuse of that system, we admonish all prosecutors, trial judges, and other affected officials to follow the rules and provide a fundamentally fair hearing at the sentencing (death penalty) phase, or be prepared to "do it again."

*Stringer v. State*, 500 So. 2d 928, 930 (Miss. 1986).

¶57. Sgt. Nick Messersmith, training director for the Jones County sheriff's department, had been assigned to the criminal investigations division on August 10, 2010. Sgt. Messersmith received a call about a suspicious injury to a child at the hospital and investigated shortly thereafter. On cross-examination, Sgt. Messersmith testified that, during the department's execution of a search warrant on Blakeney's residence, electronic evidence from both Blakeney's and Viner's cell phones and computers had been collected and sent to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for electronic evaluation. Sgt. Messersmith stated: "We received the results on discs and included in the case file but didn't use any of it in the investigation; there was very little found or if anything found that was useful to us." Sergeant Messersmith testified that he turned the information over to the district attorney's office.

25

¶58. Although Sgt. Messersmith sent the ATF report to the district attorney's office, the information was never supplied to the defense. Counsel for Blakeney objected, alleged a discovery violation, and argued that the information could have been exculpatory. Parrish contended that the prosecution had not committed a discovery violation. In response, Parrish stated, "Now, specifically what Mr. Messersmith was talking about, I don't know. But I'll go try to ask him and find out. But I don't keep exculpatory stuff. And if I had any incriminating stuff that I was going to use, you'd know about it."

¶59. Blakeney argues that the bad-faith disposal of potentially exculpatory evidence constituted reversible error. Pursuant to Mississippi Rule of Professional Conduct 3.8(d), a prosecutor must "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal." Miss. R. Prof'l Conduct Rule 3.8(b).

¶60. The Due Process Clause of the Fourteenth Amendment to the United States Constitution mandates that "criminal prosecutions must comport with prevailing notions of fundamental fairness." *Freeman v. State*, 121 So. 3d 888, 895 (Miss. 2013) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984)). Fundamental fairness includes a defendant's right to "be afforded a meaningful opportunity to present a complete defense." *Id.* (quoting *Trombetta*, 467 U.S. at 485). Thus:

> "To safeguard th[e] right [to present a complete defense], the [U.S. Supreme] Court has developed 'what might loosely be called the area of constitutionally

guaranteed access to evidence.' Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system."

*Id.* (quoting ***Trombetta***, 467 U.S. at 485).

¶61.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady v. Maryland***, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). However, in this case, the materiality of the cell phone and computer records is unknown. Therefore, the failure of the State to preserve evidentiary material which *might* have exonerated the defendant requires a showing of bad faith to be considered a violation of the Due Process Clause. ***Arizona v. Youngblood***, 488 U.S. 51, 57, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988). Therefore, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ***Id.*** at 58.

¶62.  Blakeney argues that the ATF reports were forensic evidence that did not support the State's theory that Blakeney had murdered V.V. in order to demonstrate that he was worthy of entry into the Aryan Brotherhood. Moreover, Blakeney contends that in a world that is full of digital photography on cell phones with the ability to share with others, the fact that the cell phone and computer records contained nothing incriminating demonstrates evidence in favor of Blakeney. We find that the prosecutor's failure to disclose the contents of the ATF reports was in error and in bad faith. Clearly, information on Blakeney's and Viner's cell phones and computer potentially could be useful. One of the most monumental defenses that

27

Blakeney presented was an attempt to show that he had pursued membership into the Aryan Brotherhood only after he had been in jail for years and only for protection in prison. Thus, a recent picture of Blakeney without swastika tattoos could have emphasized the defense's point that Blakeney had not been involved with the Aryan Brotherhood before he went to jail. And, as Blakeney argued, the lack of the presence of any incriminatory evidence would be in Blakeney's favor, especially in a case with minimal direct evidence against a capital-murder suspect. Surely had any mention of anger or gang initiation been present on the ATF reports, the prosecution would have introduced it into evidence. In addition, the prosecutor's statement that he had engaged in a practice of disposing of exculpatory evidence demonstrates bad faith. Therefore, prosecutorial misconduct also requires reversal in this case.

## **CONCLUSION**

¶63.  Because Blakeney was denied an opportunity to present a complete defense, because testimony and evidence from witnesses working as State agents was allowed, and because of prosecutorial misconduct, we now reverse Blakeney's conviction and sentence and remand his case for a new trial on the merits.

¶64.  **REVERSED AND REMANDED.**

**WALLER, C.J., KITCHENS, P.J., COLEMAN, BEAM AND ISHEE, JJ., CONCUR.  MAXWELL AND CHAMBERLIN, JJ., CONCUR IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. RANDOLPH, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN  OPINION.**